# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

BRAD RAFFENSPERGER, IN HIS
OFFICIAL CAPACITY AS
SECRETARY OF STATE OF
GEORGIA,

          Defendant.

Case No. 1:26-cv-00485-ELR

# BRIEF OF BIPARTISAN FORMER STATE SECRETARIES OF STATE AS AMICI CURIAE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

## **Table of Contents**

INTEREST OF AMICI ................................................................. 1

INTRODUCTION ....................................................................... 1

ARGUMENT……. ...................................................................... 3

    A.    The states, not the federal government, are charged with administering federal elections. ........................................... 3

        1.    The U.S. Constitution mandates the states' role in regulating and administering elections. ...................... 3

        2.    The Constitution prioritizes the states' accountability to voters. ......................................................... 6

        3.    State officials' election expertise surpasses that of the President. ....................................................... 6

        4.    Federal legislation confirms states' authority over voter roll list maintenance. .......................................... 7

    B.    State voter files contain sensitive information that states must protect to ensure voters' privacy. ................................ 10

    C.    States have good reason to collect confidential information, but not share that information with third parties including federal agencies. .............................................................. 15

    D.    The Federal Privacy Act prohibits DOJ's conduct here. ................. 21

CONCLUSION ....................................................................... 25

### Table of Authorities

**Cases**

*ACA Connects - Am.'s Commc'ns Ass'n v. Frey*,
    471 F. Supp. 3d 318 (D. Me. 2020) ................................................... 13

*Alabama ex rel. Gallion v. Rogers*,
    187 F. Supp. 848 (M.D. Ala. 1960), ........................................ 13, 14

*Am. C.R. Union v. Phila. City Comm'rs*,
    872 F.3d 175 (3d Cir. 2017) .......................................................... 9

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) ..................................................................... 1

*Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*,
    570 U.S. 1 (2013) ........................................................... 4, 5, 6, 10

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
    56 F.3d 791 (7th Cir. 1995) ........................................................ 5

*BedRoc Ltd. v. United States*,
    541 U.S. 176 (2004) ..................................................................... 8

*Bellitto v. Snipes*,
    935 F.3d 1192 (11th Cir. 2019) ................................................... 9

*Bellville v. Town of Northboro*,
    375 F.3d 25 (1st Cir. 2004) ........................................................ 13

*Branti v. Finkel*,
    445 U.S. 507 (1980) ................................................................... 22

*Bush v. Gore*,
    531 U.S. 98 (2000) ....................................................................... 7

*California v. Trump*,
    786 F. Supp. 3d 359 (D. Mass. 2025) ......................................... 4

*Chapman v. Houston Welfare Rts. Org.*,
    441 U.S. 600 (1979) ..................................................................... 8

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989) ..................................................................... 8

*Fish v. Kobach*, 1
    89 F. Supp. 3d 1107 (D. Kan. 2016) ............................................ 9

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ........................................................................................8

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) .........................................................................5

*Harkless v. Brunner*,
  545 F.3d 445 (6th Cir. 2008) .........................................................................5

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962) ............................................................14

*In re Gordon*,
  218 F. Supp. 826 (S.D. Miss. 1963) ............................................................14

*League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*,
  780 F. Supp. 3d 135 (D.D.C. 2025) ..........................................................4, 6

*Moore v. Harper*,
  600 U.S. 1 (2023) ...........................................................................................4

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016) ........................................................12

*Pub. Int. Legal Found., Inc. v. Bellows*,
  92 F.4th 36 (1st Cir. 2024) .....................................................................12, 14

*Sandusky Cnty. Democratic Party v. Blackwell*,
  387 F.3d 565 (6th Cir. 2004) .........................................................................9

*Smiley v. Holm*,
  285 U.S. 355 (1932) ........................................................................................4

*Storer v. Brown*,
  415 U.S. 724 (1974) .....................................................................................6, 7

*Thornhill v. Alabama*,
  310 U.S. 88 (1940) ........................................................................................11

*True the Vote v. Hosemann*,
  43 F. Supp. 3d 693 (S.D. Miss. 2014) ..........................................................12

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) ........................................................................................4

*United States v. Gradwell*,
  243 U.S. 476 (1917) ..............................................................................5, 6, 15

*United States v. Benson*,
  No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ..................3

*United States, v. State of Oregon*, --- F.Supp.3d ----, No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ........................................................3, 5, 15

*United States v. Weber,*
   --- F.Supp.3d ----, No. 2:25-CV-09149-DOC-ADS,
   2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ...................................2, 5, 15, 22, 25

**Statutes**

5 U.S.C. § 552a(a)(3) .................................................................................23

5 U.S.C. § 552a(a)(5) .................................................................................23

5 U.S.C. § 552a(e)(11) ...............................................................................23

5 U.S.C. § 552a(e)(4) .................................................................................23

5 U.S.C. § 552a(e)(7) .................................................................................22

52 U.S.C. § 20507(a)(4) ...........................................................................8, 9

52 U.S.C. § 20507(i) ..................................................................................12

52 U.S.C. § 20701 ......................................................................................13

52 U.S.C. § 20703 ......................................................................................13

52 U.S.C. § 21083 ......................................................................................13

52 U.S.C. § 21083(a) ...............................................................................9, 10

**Other Authorities**

3 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ...........6, 15

Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025)................................................................20

*Cyber Threat Snapshot*, House Committee on Homeland Security......................17

Cybersecurity & Infrastructure Security Agency, *Election Security* ......................17

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times at 1 (Sept. 9, 2025).........................................25

*Global Malicious Activity Targeting Elections Is Skyrocketing*, Resecurity (Feb. 12, 2024) ..................................................................................................17

Lauren Feiner, *America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025) ..................................................................................................17

Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017)...........................................................................................18

Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025)........19

Matt Cohen & Zachary Roth, *DOJ Is Said to Plan to Contact All 50 States on Voting Systems*, Democracy Dkt. (July 29, 2025) ...............................................24

Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025).....................................................16

Mitch McConnell, Opinion, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025)............................................................................................................9

National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025)........................................................................10, 11

Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016)........23, 24

Office of the Georgia Secretary of State, *VoteSafe* ................................................11

Office of the Minnesota Secretary of State, *Other States with Programs Like Safe at Home* ..................................................................................................................11

Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017) ...................................................................................19

S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 168 (1976) .........................................21, 22

Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025) ...................................................................7

*The Federalist* No. 59, at 363 (Alexander Hamilton) (Clinton Rossiter ed., 1961)  6

Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J. ............................................17, 18

U.S. Dep't of Just., Overview of the Privacy Act of 1974 (2020 ed.) ....................21

U.S. Gov't Accountability Off., GAO-24-107231, *High-Risk Series: Urgent Action Needed to Address Critical Cybersecurity Challenges Facing the Nation* 1 (2024)....................................................................................................................16

*US Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7, 2025) ...................................................................................................................16

*US Warns That Hackers Using F5 Devices to Target Government Networks*, Reuters (Oct. 15, 2025)........................................................................................16

William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993* (May 20, 1993)..........................................................................................10

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ........................................................................3

## INTEREST OF AMICI

Amici are a bipartisan group of former state secretaries of state from throughout the United States who, in those roles, oversaw elections in multiple states. *See* Appendix A. As the District Court for the District of Columbia recently concluded in granting these Amici leave to file a similar amicus brief in election-related litigation there, "[a]s former state election officials, [A]mici offer a unique perspective not presented by the parties. And their proposed brief is relevant and helpful." Minute Order, *League of United Latin Am. Citizens v. Exec. Off. of President*, No. 1:25-cv-00946 (D.D.C. Apr. 24, 2025).

## INTRODUCTION

Amici respectfully request that the Court grant Defendant's motion to dismiss.  Amici—as former secretaries of state—faithfully oversaw elections across the "laboratories" of electoral democracy: the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici themselves participated in fulfilling the Framers' wisdom in giving states authority to enact election laws and administer elections, as set forth in the Elections Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "deference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater

citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* (citation modified).

In the matter before this Court, the United States seeks an order directing the Secretary of State of Georgia to turn over to the U.S. Department of Justice a computerized voter registration list of over eight million registered voters, inclusive of "all fields." Compl. at 7, ¶ 20. Granting the federal government that relief would upend our constitutional framework by interfering with Georgia's management of its voter registration system and protection of sensitive voter information, including driver's license and social security numbers. The federal government's demand is contrary to the federalism and separation of powers principles codified in the Constitution's Elections Clause and contrary to federal law. As a California district court concluded just weeks ago in dismissing with prejudice a nearly identical lawsuit against the State of California, "the Department of Justice seeks to use civil rights legislation which was enacted for an entirely different purpose to amass and retain an unprecedented amount of confidential voter data. This effort goes far beyond what Congress intended when it passed the underlying legislation." *United States v. Weber,* --- F.Supp.3d ----, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807, at *20 (C.D. Cal. Jan. 15, 2026). Now district courts in Oregon and Michigan have followed suit, dismissing similar

complaints. *See United States, v. State of Oregon*, --- F.Supp.3d ----, No. 6:25-CV-

01666-MTK, 2026 WL 318402, (D. Or. Feb. 5, 2026); *United States v. Benson*,

No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026).

Simply put, the federal government's claims "represent an overreach and

misuse of those limited constitutional exceptions designed to ensure decentralized

election regulation" and thus "disturb the framework of federalism envisioned and

enshrined in our Constitution." *Oregon*, 2026 WL 318402, at *13. Amici submit

this brief to protect these fundamental Constitutional principles, to ensure the

integrity of Georgia's voter registration records, and to respectfully request that the

Court grant Defendant's motion to dismiss.

## ARGUMENT

### A. The states, not the federal government, are charged with administering federal elections.

#### 1. The U.S. Constitution mandates the states' role in regulating and administering elections.

The Constitution explicitly gives states, not the federal government, the

primary responsibility to enact election laws and administer elections. The

Elections Clause establishes: "The Times, Places and Manner of holding Elections

for Senators and Representatives, shall be prescribed *in each State by the*

*Legislature thereof*; but the Congress may at any time by Law make or alter such

Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl.

1 (emphasis added).

The Constitution thus empowers the states with "sweeping" authority to enact election laws, subject only to other provisions of the Constitution and preemption by Congress. *League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*, 780 F. Supp. 3d 135, 157 (D.D.C. 2025). As the Supreme Court has explained, the Elections Clause's "substantive scope is broad. 'Times, Places, and Manner' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections . . . .'" *Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*, 570 U.S. 1, 8-9 (2013) (emphases added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *California v. Trump*, 786 F. Supp. 3d 359, 372 (D. Mass. 2025), *appeal filed*, No. 25-1726 (1st Cir. Aug. 1, 2025) (same). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [and 2] upon Congress it confers the power to alter those regulations or supplant them altogether." *ITCA*, 570 U.S. at 8 (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05 (1995)); *see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (states hold "constitutional duty to craft the rules governing federal elections"). "In other words, only Congress has the power to adjust state election rules." *California*, 786 F. Supp. 3d at 379.

In addition to assigning states the primary responsibility to regulate elections, the current regime enacted pursuant to the Elections Clause also makes

states responsible for administering federal elections. The Elections Clause "places the burden of administering federal elections on the states." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures."), *aff'd sub nom. ITCA*, 570 U.S. 1; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting) (stating Elections Clause "reserv[es] to the States default responsibility for administering federal elections").

"There is an inherent level of trust that comes along with Americans voting locally. This is why, since the founding of our nation, the Elections Clause has constitutionally prevented the centralization of election management in the Executive by affording states the power to determine the 'times, places and manner of holding elections.'" *Weber*, 2026 WL 118807, at *2; *see also Oregon*, 2026 WL 318402, at *1. In sum, it has long been "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," subject only to Congress' power "to regulate such elections . . . by positive and clear statutes." *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

### 2. The Constitution prioritizes the states' accountability to voters.

The Elections Clause reflects the Framers' view that, given state officials' accountability and proximity to local needs, states are well-situated to regulate and administer federal elections, subject only to Congressional preemption. As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 *Records of the Federal Convention of 1787* 391 (Max Farrand ed., 1911); *Gradwell*, 243 U.S. at 484. Even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." *The Federalist* No. 59, at 363 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *accord Gradwell*, 243 U.S. at 484-85; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting); *LULAC*, 780 F. Supp. 3d at 159. And although the Constitution allows Congress to act as a check on a runaway state legislature's regulation of elections, nowhere does it authorize the President to do so without clear authorization from the legislative branch. *See generally Gradwell*, 243 U.S. at 484–85. There is no such authorization here. In fact, as discussed below, Congress has prohibited the federal government's attempted actions here.

### 3. State officials' election expertise surpasses that of the President.

"[T]here must be a substantial regulation of elections if they are to be fair

and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). In practice, the Elections Clause creates a regime in which state officials—like Amici, who possess unique expertise in local election procedures that the federal government, and especially the President, simply does not have—carry out this needed regulation. *See Bush v. Gore*, 531 U.S. 98, 109 (2000). Unlike the federal government, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Storer*, 415 U.S. at 730.

### 4. Federal legislation confirms states' authority over voter roll list maintenance.

Congress and the President recognized this truth when they adopted the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). The NVRA was enacted in 1993 to help increase voter registration by, among other things, requiring states to offer voter registration opportunities when individuals apply for or renew a driver's license. *See, e.g.*, Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025). HAVA was enacted in 2002 to help states modernize their election systems

in response to voting problems in the 2000 presidential election. *Id.* at 12. Both statutes reaffirmed the states' authority over election management. The NVRA and HAVA provide federal assistance to state election officials, but they do not limit or otherwise undermine the states' plenary authority over election management.

Under both the NVRA and HAVA, the states—not the federal government —are responsible for voter roll list maintenance. In interpreting the NVRA and HAVA, courts must "interpret the words of these statutes in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 608 (1979). Specifically, a court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Here, the text of both the NVRA and HAVA is unequivocal: *States* are responsible for voter roll list maintenance. Specifically, the NVRA, 52 U.S.C. § 20507(a)(4), provides that "each ***State*** shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." (emphasis added). The NVRA's "text unambiguously

mandates that the *states* maintain a 'general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of' only two things: death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019) (emphasis added) (quoting 52 U.S.C. § 20507(a)(4)). The same is true regarding HAVA, which repeatedly requires states to define, maintain, and administer voter lists. *See* 52 U.S.C. § 21083(a)(1)(A), (a)(4)(A); *see also Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 181 (3d Cir. 2017) ("Similar to the NVRA, the HAVA requires *states* to 'perform list maintenance' of the computerized voting rolls." (emphasis added) (quoting 52 U.S.C. § 21083(a)(2)(A))).

Because the text of the NVRA and HAVA makes clear that states are charged with voter roll list maintenance, any interpretation to the contrary must be rejected. Further, "[n]owhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004).[1] The NVRA, which

---

[1] As Senator Mitch McConnell explained earlier this year: "[D]elegation of authority over election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols." Mitch McConnell, Opinion, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's elections.").

primarily achieves its objectives by "creating national registration requirements for federal elections," *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1113 (D. Kan. 2016), *aff'd*, 840 F.3d 710 (10th Cir. 2016), likewise authorizes, and relies on, the states to implement and facilitate its provisions. Specifically, the very "purpose of the federal [voter registration] form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J., dissenting) (emphasis added); William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993* (May 20, 1993), https://perma.cc/AHT3-H4S8 (describing NVRA's "implementation by States").

In short, through the NVRA and HAVA, Congress confirmed *states',* not the federal government's, authority to administer voter roll lists. This Court should give full effect to Congress' intent.

### B. State voter files contain sensitive information that states must protect to ensure voters' privacy.

Each state's voter files contain sensitive nonpublic information about voters, which states have both a right and an obligation to protect. Federal law requires that every voter registration application for registration in a federal election contain *at least* the voter's driver's license ("DL") number, the last four digits of the voter's social security number ("SSN"), or other unique identifying information. 52 U.S.C. § 21083(a)(5)(A). In addition, voter files commonly include additional nonpublic information about voters beyond what is federally mandated, such as

addresses, phone numbers, birth dates, and full SSNs. *See, e.g.*, National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/emnvjnj5 (aggregating information about the contents of state voter rolls).

States have an interest in protecting such information from disclosure. *See, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88, 105 (1940) ("[T]he duty of the State" to protect privacy of its residents "cannot be doubted."). In fact, many states—including Georgia—have enacted statutes either prohibiting disclosure of confidential information contained in the voter file or limiting the use of such information.[2] And 44 states—including Georgia—and the District of Columbia have either an address confidentiality program ("ACP") or a "Safe at Home" law that provides additional confidentiality protections for certain groups of voters, such as victims of domestic violence, sexual assault, stalking, and other crimes. *See* O.C.G.A. § 21-2-225.1; *see also* Office of the Georgia Secretary of State, *VoteSafe*, https://tinyurl.com/yxhf3pv8 (last visited Feb. 6, 2026); *see also* Office of the Minnesota Secretary of State, *Other States with Programs Like Safe at Home*, https://perma.cc/4YR5-HPMH (last visited Jan. 26, 2026) (listing states that

---

[2] Georgia law protects the disclosure of voters' month and day of birth, social security number, email address, driver's license number, and the location at which they applied to register to vote. *See* O.C.G.A. § 21-2-225(b). Georgia law also provides a method for making the home addresses of state and federal judges confidential in the voter file upon their request. *See* O.C.G.A. § 15-5-110 *et seq.*

have created ACPs or enacted Safe at Home laws). These voter groups are at elevated risk of harm if the confidential information in their voter files is disclosed. States have a heightened interest in protecting such citizens by keeping confidential voter information private.

Moreover, nothing in the NVRA or HAVA supersedes—or even conflicts with—these state confidentiality rules and protections. The NVRA's public disclosure provision contains no mention of confidential information and no requirement that such information be disclosed. *See* 52 U.S.C. § 20507(i). To the contrary, several jurisdictions, including this one, expressly recognize that states can refuse to turn over confidential information in the voter file without running afoul of the NVRA. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *see also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014) ("[T]he Public Disclosure Provision [of the NVRA] . . . does not, as a general proposition, prohibit a State from protecting voter registrants' SSNs and birthdates as highly personal and sensitive information.");.

Nor does HAVA conflict with state confidentiality rules. That statute does not even contain a public disclosure requirement, let alone a requirement that state agencies turn over confidential voter information to the federal government. *See generally* 52 U.S.C. § 21083. Thus, states can comply with their obligations under the NVRA and HAVA without acceding to federal demands for confidential information. Indeed, many state laws prohibit cooperation entirely.

Similarly, states need not disclose confidential information about their voters to comply with the Civil Rights Act of 1960 ("CRA"). The CRA allows the United States Attorney General to request inspection of state voter rolls for the purpose of investigating "alleged discriminatory practices." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *see also* 52 U.S.C. §§ 20701, 20703 (retention and inspection provisions of the CRA). But the federal government does not allege any discriminatory practices here. And even assuming the Attorney General were to request inspection of voter rolls for legitimate purposes of a civil rights investigation (which is not the case here), there is no reason to believe that states cannot comply with the CRA's inspection provision while also protecting the confidentiality of sensitive voter information.[3]

---

[3] Nothing in the text of the CRA's records provisions preempts state privacy protections and preemption is not implied. *See generally* 52 U.S.C. §§ 20701-20706 (no mention of preemption). There is "a strong presumption against implied

The CRA and voter confidentiality protections are not contradictory. The purpose of the CRA was to allow the Attorney General to investigate the alleged disenfranchisement of voters based on race. *Gallion*, 187 F. Supp at 854. It does not give federal officials an unfettered right of access to confidential information about voters in general. *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("It is . . . a mistaken view to assume that [an] investigation of [state voting] records is an unlimited discovery device which may be employed and used without restraint . . . ."); *see also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (recognizing exception to inspection right "when the purpose is speculative, or from idle curiosity"), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). States can comply with the CRA while also protecting confidential voter information, as courts have repeatedly recognized in other contexts. *See, e.g.*, *Pub. Int. Legal Found.*, 92 F.4th at 56 (allowing redaction of sensitive personal information in voter file when complying with disclosure requirements of NVRA). This principle applies in this context as well, allowing states to comply with

---

federal preemption of state law," which is strongest "in fields of traditional state regulation." *ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020) (citation omitted). "Privacy regulation is just such a field." *Id.*; *see also Bellville v. Town of Northboro*, 375 F.3d 25, 31 (1st Cir. 2004) ("The states, of course, are free to accord their citizens rights beyond those guaranteed by federal law."). There is no statutory or case law authority suggesting that a state cannot take appropriate steps to protect confidential information about its residents while also complying with the CRA.

appropriate inspection requests by the Attorney General while also redacting or withholding confidential information in the voter file in accordance with state privacy rules.

Simply put, "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber,* 2026 WL 118807, at *12; *see also Oregon*, 2026 WL 318402, at *11. Nothing in these statutes requires that states turn over voters' personally identifiably information ("PII").

## C. States have good reason to collect confidential information, but not share that information with third parties, including federal agencies.

As described above, because states administer elections, state law governs the circumstances when voters' confidential information must be collected as part of the voter registration process. But it does not follow that just because *states* possess voters' confidential information, the federal government is authorized to access it, nor that voters want that information shared with any third parties, including the federal government.

As the founders recognized, state governments are "best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to produce uniformity and prevent its own dissolution." *Gradwell*, 243

U.S. at 484 (quoting 3 *Records of the Federal Convention of 1787* 311 (Max

Farrand ed., 1911)). And there are also practical concerns with states sharing, and

the federal government aggregating, sensitive voter information. There is always a

risk that electronically stored data could be hacked, breached, or stolen. And each

time data is shared, that risk necessarily increases, both during the transfer process

and because each custodian of records adds an additional target.

Here, the federal government's efforts to create a national voter roll for the

first time compound the risk of exposing private voter information. Moreover, the

federal government is an especially attractive target for hackers, particularly for

those working on behalf of nation-states. For example, federal agencies reported

over 30,000 security incidents in fiscal year 2022 alone. U.S. Gov't Accountability

Off., GAO-24-107231, *High-Risk Series: Urgent Action Needed to Address*

*Critical Cybersecurity Challenges Facing the Nation* 1 (2024). The threat of such

attacks is only growing. *See US Warns That Hackers Using F5 Devices to Target*

*Government Networks*, Reuters (Oct. 15, 2025), https://perma.cc/E8E2-ZEGX; *see*

*also* Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since*

*Early 2024, Report Says*, FedScoop (Oct. 15, 2025), https://perma.cc/Y85P-884Z.

Indeed, in November, hackers breached the U.S. Congressional Budget Office. *US*

*Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7,

2025), https://perma.cc/Y64D-JMQN/.

Furthermore, the Department of Homeland Security ("DHS") designates election infrastructure as "critical infrastructure," which "recognizes that the United States' election infrastructure is of such vital importance to the American way of life that its incapacitation or destruction would have a devastating effect on the country." Cybersecurity & Infrastructure Security Agency, *Election Security*, https://perma.cc/U6MC-F3C3 (last visited Nov. 18, 2025). In making that designation, DHS "cited cyberattacks on American systems as potentially more sophisticated and dangerous than ever, and elections as a primary target of cyber criminals." White Paper delivered to National Association of Secretaries of State, *Securing Elections Critical Infrastructure* 3 (2020), https://perma.cc/48MC-C49D.

Unsurprisingly, even since that designation, critical infrastructure remains squarely in the crosshairs of hackers. In 2024, roughly 70% of all cyberattacks involved critical infrastructure. *Cyber Threat Snapshot*, House Committee on Homeland Security, https://perma.cc/R829-ZN25 (last visited Nov. 18, 2025). That trend maps onto increased cyber-attacks on election systems globally. *Global Malicious Activity Targeting Elections Is Skyrocketing*, Resecurity (Feb. 12, 2024), https://perma.cc/KNV2-7EHP. And concerns about the security of American election infrastructure are even more pronounced now after the federal government recently downsized and cut funding for the Cybersecurity and Infrastructure Security Agency, which is tasked with protecting—among other things—election

infrastructure. *See* Lauren Feiner, *America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025), https://perma.cc/XR9D-ZCRT. Experts, including current Arizona Secretary of State Adrian Fontes, are sounding the alarm that changes during the current administration are further weakening the country's already-strained cyber election protection apparatus. *Id.* As a result, by trying to force multiple states to send their otherwise disparate sets of sensitive voter information to the same government repository, the federal government is only making the bullseye brighter for bad actors, while simultaneously removing security obstacles between hackers and their targets.

The concerns do not end there. The federal government has a long and checkered history of infringing on individuals' privacy rights, including concerning confidential voter information. In 2017, the Presidential Advisory Commission on Election Integrity sent letters to state election officials across the country seeking all publicly available voter roll data, including all registrants' full first and last names, middle names or initials, addresses, dates of birth, political party, last four digits of Social Security numbers if available, voter history from 2006 onward, information regarding any felony convictions, voter registration in another state, and military status. Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017), https://perma.cc/J7TA-ALKV.

State officials—sometimes colorfully—expressed grave concerns. Kentucky Secretary of State Alison Lundergan Grimes said there was "not enough bourbon here in Kentucky to make this request seem sensible. . . . Not on my watch are we going to be releasing sensitive information that relate to the privacy of individuals." Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J. (last updated July 1, 2017), https://perma.cc/QF7G-MV8G. She explained, "I'm not going to risk sensitive information for 3.2 million Kentuckians getting in the wrong hands, into the public domain and possibly for the wrong reasons, to keep people away from the ballot box." Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017), https://perma.cc/2AEE-AL4E. Mississippi Secretary of State Delbert Hosemann emphasized that states "conduct[] our own electoral processes," and suggested "[the Commission] can go jump in the Gulf of Mexico and Mississippi is a great State to launch from." *Id.*

The same concerns about sharing voters' sensitive and confidential information with the government apply with equal force now, as do states' justifications for choosing not to do so. Indeed, in a recent letter to Attorney General Pam Bondi and Homeland Security Secretary Kristi Noem, secretaries of state from Arizona, California, Colorado, Maine, Minnesota, Nevada, New Mexico, Oregon, Vermont and Washington—all of which oversee elections in their

states—demanded answers on how private voter data was being used by the federal government. Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025), https://perma.cc/3U4N-PWXB. The secretaries noted, among other concerns, that their states' voter registration lists include sensitive voter information, including dates of birth, state driver's license numbers, and the last four digits of Social Security numbers. *Id.* Alarmingly, recent reporting suggests that the federal government is considering sharing the state voter rolls it obtains— including voters' confidential information—with third-party organizations. *See* Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025), https://perma.cc/W8UC-XHRS (quoting an employee of EagleAI, a mass voter registration challenge system, as stating "[w]e demonstrated the software to the DOJ. . . . I am in conversation with them about letting us have a task, a federal task, to bring their data into what we're doing and then be able to use the federal data, SAVE data, Social Security data, other data in here as well."). This is especially concerning given the federal government's increasingly coercive efforts to collect voter PII, such as in Minnesota, where the U.S. Attorney General sent a demand letter to the Governor—merely days after federal agents killed two American citizens in Minneapolis—conditioning the

withdrawal of federal agents from Minnesota on the state turning over its voters'

data to the federal government.[4]

### D. The Federal Privacy Act prohibits the federal government's conduct here.

For precisely the sort of reasons described by the secretaries above, the

Privacy Act of 1974 places limits on a state's ability to share sensitive information

with federal agencies. Congress passed the Privacy Act in response to the

Watergate and Counterintelligence Program (COINTELPRO) scandals, which

exposed the dangers of unchecked government domestic surveillance and data

collection. The Privacy Act was designed to place "limits upon what the

Government can know about each of its citizens." U.S. Dep't of Just., Overview of

the Privacy Act of 1974 at 1 (2020 ed.), https://perma.cc/26QS-5WHE (citation

omitted). Accordingly, the Privacy Act "sought to restore trust in government and

to address what at the time was seen as an existential threat to American

democracy." *Id.*

To that end, the Privacy Act sought to prevent the federal government from

creating "formal or de facto national data banks" or "centralized Federal

information systems" that would consolidate sensitive personal data of Americans

---

[4] Jeff Wald, *Minneapolis shooting: AG Pam Bondi gives Gov. Walz conditions for ICE to leave Minnesota*, FOX 9 Minneapolis-St. Paul (Jan. 25, 2026), https://perma.cc/9EME-ZREP; *see also* https://perma.cc/KE7Q-5FJJ (full text of demand letter).

stored at separate agencies. S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 168 (1976), https://perma.cc/DZ4J-Y2TE. Congress established robust safeguards against such "interagency computer data banks" to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system." *Id.* at 884, 217.

The federal government's actions here contravene many of the Privacy Act's requirements. First, the Privacy Act forbids collecting or maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Here, the federal government explicitly requests "all fields" from Georgia's electronic statewide voter registration list. Compl. at 7, ¶ 20. By requesting all fields, the federal government is seeking, for example, each voter's party registration, which is one way an individual exercises rights guaranteed by the First Amendment. *See Branti v. Finkel*, 445 U.S. 507, 519 (1980) (holding political party affiliation is protected under the First Amendment). This violates the Privacy Act. *See Weber*, 2026 WL

118807, at *17 ("The Privacy Act bars DOJ's request for California's unredacted voter roll because fulfillment of that request would include information regarding previous election participation and party affiliation.").

Second, the Privacy Act imposes procedural guardrails on what agencies must do prior to establishing a "system of records," defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Any time the federal government "maintain[s], collect[s], use[s], or disseminate[s]" such, records, it *must* abide by notice-and-comment requirements and safeguards against data misuse, and follow information-security mandates. *Id.* at § 552a(a)(3), (e)(1)–(12). Critically, when an agency establishes or revises any system of records, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records," *id.* § 552a(e)(4), called a System of Records Notice ("SORN"). And at least 30 days *prior* to such publication, an agency must publish a "notice of any new use or intended use of the information in the system and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

Issuance of a SORN is not mere window-dressing. SORNs "shall include" nine categories of information. *Id.* § 552a(e)(4). These crucial details provide much

needed transparency about both how the federal government intends to use the information and how it is protecting the information in the system of records. And publishing a SORN is mandatory. Guidance issued contemporaneously with the Privacy Act is unequivocal: "*In no circumstance* may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following *Federal Register* publication." Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016), https://perma.cc/QZZ3-EB67 (emphases added). Moreover, agencies "shall" not only solicit but also review any "public comments on a published SORN" to "determine whether any changes to the SORN are necessary." *Id.* The "requirement for agencies to publish a SORN allows the Federal Government to accomplish one of the basic objectives of the Privacy Act—fostering agency accountability through public notice." *Id.* at 5.

Here, the federal government has not published a SORN nor any other notice describing how it intends to use the state voter roll data it is attempting to collect. Failure to issue such a notice is, itself, a violation of the Privacy Act. This lack of transparency also raises serious privacy concerns for Georgia voters, who entrusted their personal information to the State—not to the federal government. And this significant privacy concern is not confined to Georgia. The federal government has publicly stated that it intends to seek voter roll records from all 50 states. Matt

Cohen & Zachary Roth, *DOJ Is Said to Plan to Contact All 50 States on Voting Systems*, Democracy Dkt. (July 29, 2025), https://perma.cc/H8HL-BDGU. Indeed, the federal government has already sued 24 states, the District of Columbia, and one county for declining to provide such data.[5] These actions are consistent with the federal government's broader effort to build a "national voter roll." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times at 1 (Sept. 9, 2025), https://tinyurl.com/2m7bhh58. But in doing so, the federal government violates the Privacy Act, which "remains a protection for the American people. Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of [Georgians]." *Weber*, 2026 WL 118807, at *18.

## CONCLUSION

"The centralization of this information by the federal government would have a chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose. This risk threatens the right to vote which is the cornerstone of American democracy." *Id.* at *20. For the reasons stated above, Amici respectfully request that the Court grant the Defendant's motion to dismiss.

---

[5] Kaylie Martinez Ochoa, Eileen O'Conner, & Patrick Berry, Tracker of Justice Department Requests for Voter Information, Brennan Ctr. for Just. (last updated Feb. 11, 2026), https://tinyurl.com/ypf63y95.

DATED: February 18, 2026

/s/ T. Brandon Waddell
T. Brandon Waddell
Ga. Bar No. 252639
Michael A. Caplan
Ga. Bar No. 601039
Ashley C. Brown
Ga. Bar No. 287373
Jessica Arnold Caleb
Ga. Bar No. 141507
**CAPLAN COBB LLC**
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604
bwaddell@caplancobb.com
mcaplan@caplancobb.com
abrown@caplancobb.com
jcaleb@caplancobb.com

DONALD K. SHERMAN*
JOHN B. HILL*
dsherman@citizensforethics.org
jhill@citizensforethics.org
Citizens for Responsibility and Ethics in
Washington
PO Box 14596
Washington, DC 20004
Telephone: 202.408.5565

*Attorneys for Amici Curiae*

*\*application for admission pro hac vice
forthcoming*

## <u>LOCAL RULE 7.1(D) CERTIFICATE</u>

The undersigned hereby certifies that the foregoing document has been formatted in Times New Roman font, 14-point type, which complies with the font size and point requirements of Local Rule 5.1(C).

This 18th day of February, 2025.

<u>*/s/ T. Brandon Waddell*</u>
T. Brandon Waddell
Georgia Bar No. 252639

*Attorneys for Amici Curiae*

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I caused a true and correct copy of the foregoing document to be filed with the clerk's office by this Court's CM/ECF system, which will serve a true and correct copy of the same upon all counsel of record.

This 18th day of February, 2025.

*/s/ T. Brandon Waddell*
T. Brandon Waddell
Georgia Bar No. 252639

*Attorneys for Amici Curiae*
