UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br>    v.<br><br>BRAD RAFFENSPERGER, in his<br>Official Capacity as Secretary of State<br>for the State of Georgia,<br><br>              Defendant. | Case No.: 1:26-CV-485-ELR |

**UNITED STATES' CONSOLIDATED MEMORANDUM IN SUPPORT OF
ITS CROSS-MOTION TO COMPEL (DOC. 31) AND IN OPPOSITION TO
MOTIONS TO DISMISS BY SECRETARY RAFFENSPERGER AND
INTERVENOR-DEFENDANTS (DOCS. 16, 22, & 23)**

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................1

II.    BACKGROUND ...........................................................................4

III.   THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE
FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF
THE CRA.......................................................................................8

   A.   The Federal Rules of Civil Procedure are inapplicable to motions to compel
   under Section 305 of the CRA. .............................................................9

   B.   Title III of the CRA does not require allegations that the federal election
   records demanded are needed to investigate race-based denial of voting rights. .16

   C.   Defendants cannot challenge the Attorney General's basis and purpose to
   investigate Georgia's HAVA and NVRA compliance.........................................23

   D.   Georgia's SVRL falls within Section 301's broad definition of "all records
   and papers" relating to registration to vote in federal elections...........................27

   E.   The United States is entitled to unredacted "reproduction" and "copying" of
   Georgia's federal election records, including its SVRL. .....................................34

IV.    THE UNITED STATES IS COMPLYING WITH APPLICABLE
FEDERAL PRIVACY LAWS.................................................................38

A.    The United States is complying with the Privacy Act. ..............................39

B.    The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims. .....................................................42

C.    The Driver's Privacy Protection Act does not allow Secretary Raffensperger to deny the United States list maintenance data. ....................................................44

V.    CONCLUSION.................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)............................4

*Becker v. United States*, 451 U.S. 1306 (1981) ................................................. 15, 16

*Becker v. United States,* 452 U.S. 912 (1981) ...........................................................15

*Becker v. United States,* 452 U.S. 935 (1981) ...........................................................15

*Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981)...........................3

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ........................................ 22, 23

*Coal. for Open Democracy v. Scanlan*,

    No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025)........................38

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962)...................... 18, 25, 26

*Donaldson v. United States*, 400 U.S. 517 (1971)....................................................16

*Ebert v. Poston*, 266 U.S. 548 (1925)........................................................................21

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F.

    Supp. 3d 297 (D.D.C. 2017)...............................................................................43

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878

    F.3d 371 (D.C. Cir. 2017) ..................................................................................44

*Ex Parte Siebold*, 100 U.S. 371 (1879)......................................................................4

*Foster v. Love*, 522 U.S. 67 (1997).............................................................................4

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) .................................................12

*Judicial Watch v. Lamone,* 399 F. Supp. 3d 425 (D. Md. 2019)............................29

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)................................................. passim

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) ..............29

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) .........................................4

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960) .................................................................................................. 10, 11, 12

*United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG (W.D. Mich. Feb. 10, 2026).................................................................................................... passim

*United States v. Bisceglia*, 420 U.S. 141 (1975).....................................................10

*United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006) ...............33

*United States v. Great N. Ry. Co.,* 343 U.S. 562 (1952) .........................................22

*United States v. Lignarolo*, 770 F.2d 971 (11th Cir. 1985) ....................................21

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ......................................21

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ...................... 11, 14, 25, 37

*United States v. Oregon*, Case No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026) ...13, 15

*United States v. Powell*, 379 U.S. 48 (1964) .................................................. passim

*United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal. Jan. 15, 2026).................................................................................................. 13, 15

*Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006) ........................................................... 7

**Statutes**

10 U.S.C. § 130c ............................................................................................. 31

13 U.S.C. § 214 ............................................................................................... 31

18 U.S.C. § 2725 ............................................................................................. 44

18 U.S.C. § 2721 ......................................................................................... 44, 45

26 U.S.C. § 7605 ............................................................................................. 14

30 U.S.C. § 1732 ............................................................................................. 31

42 U.S.C. § 2000e-2 ........................................................................................ 18

42 U.S.C. § 3617 ............................................................................................. 18

42 U.S.C. §§ 3604-3606 ................................................................................. 18

44 U.S.C. § 3101 ............................................................................................. 40

44 U.S.C. § 3572 ............................................................................................. 31

5 U.S.C. § 552a ............................................................................................... 41

52 U.S.C. § 10101 ........................................................................................... 18

52 U.S.C. § 10309 ........................................................................................... 18

52 U.S.C. § 20701 ................................................................................... passim

52 U.S.C. § 20703 ................................................................................... passim

52 U.S.C. § 20704 ........................................................................................... 35

52 U.S.C. § 20705 ............................................................................... 2, 5, 23

52 U.S.C. §§ 10301-10306 .................................................................18

52 U.S.C. § 20510 ..............................................................................6

52 U.S.C. §§ 20701-20706 ....................................................... 14, 18

8 U.S.C. § 1449 .................................................................................32

8 U.S.C. § 1445 .................................................................................32

CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960) ...............................17

The E-Government Act, Pub. L. No. 107–347, § 208 ...................... 42, 43

The Privacy Act, Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974)......................42

## Other Authorities

14D Richard D. Freer, Federal Practice & Procedure § 3801 (4th ed.)....................7

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the

    Electoral Process (Aug. 2021).............................................................20

*Webster's New World Dictionary of the American Language* (8th coll. ed. 1960).30

*Webster's Third New International Dictionary* (1966 ed. unabridg.) .....................31

## Regulations

28 C.F.R. § 0.51 .................................................................................40

28 C.F.R. § 0.50 .................................................................................40

U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-

    01 (May 25, 2017) ...........................................................................40

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ............................................................................4

**Legislative Materials**

106 Cong. Rec. 7767 ..................................................................................18

H.R. Rep. 107-329, pt. 1 (2001) ...............................................................20

Plaintiff United States of America respectfully submits this consolidated Memorandum of Law in support of its Cross-Motion to Compel production of federal election records pursuant to Title III of the Civil Rights Act of 1960 ("CRA") (Doc. 31), and in opposition to the Motions to Dismiss by Defendant Secretary of State Brad Raffensperger ("Secretary Raffensperger") (Doc. 16), Intervenor-Defendants Common Cause and Rosario Palacios ("Common Cause Intervenors") (Doc. 22), and Intervenor-Defendants Black Voters Matter Fund, Communication Workers of America Local 3204, and Communication Workers of America Retired Members Council ("BVMF Intervenors") (Doc. 23). Secretary Raffensperger, Common Cause Intervenors, and BVMF Intervenors are collectively referred to as "Defendants." The United States submits this consolidated Memorandum to facilitate the Court's review of the duplicative and overlapping arguments made by the Defendants.

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Georgia's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States sent correspondence to Secretary Raffensperger, requesting his cooperation in providing federal election records necessary to its assessment in a manner

consistent with federal privacy law. Those efforts were met by Secretary Raffensperger's refusal to produce records as mandated by federal law and necessary to evaluate compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including Georgia's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the officers of election relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As this Circuit recognizes, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[1]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the

---

[1] The decision in *Kennedy v. Lynd* is controlling in this Circuit. Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit "subject to the power of the Eleventh Circuit sitting

Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. §§ 20703, 20706.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Defendants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for the motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States' Cross-Motion to Compel (Doc. 31) should be granted, Defendants' Motions to Dismiss (Docs. 16, 22, 23) should be denied, and an order compelling production of Georgia's SVRL and other responsive federal election records should be entered.

---

en banc to overrule any such decision." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1210 (11th Cir. 1981).

3

## II.    BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices.  The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained the meaning of the Elections Clause as follows:

> The [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus it is well settled that the Elections Clause grants Congress "the power to override state regulations" by establishing uniform rules for federal elections, binding on the States.

*Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

4

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id*. Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA. *See* 52 U.S.C. §§ 20703, 20705. The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).Acting pursuant to the United States' authority to enforce these federal election statutes, on August

5

7, 2025, the Department of Justice sent Secretary Raffensperger, Chief Election officer of Georgia, a letter inquiring about Georgia's practices in complying with federal list maintenance requirements ("August 7 Letter"). Ex. 1 to Decl. of Eric Neff ("Neff Decl."). The August 7 Letter requested a copy of Georgia's statewide voter registration list ("SVRL") within fourteen days of the date of the letter.

On August 14, 2025, the Department of Justice sent Secretary Raffensperger a second letter requesting, *inter alia*, that Georgia provide a current electronic copy of its computerized SVRL ("August 14 Letter"). Ex. 2 to Neff Decl. As stated in the letter, the basis for the demand was Title III of the Civil Rights Act of 1960 (CRA) codified at 52 U.S.C. § 20701, *et seq,* and the purpose was to "ascertain Georgia's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* The letter informed Secretary Raffensperger that the list is subject to federal privacy protections, specifically Section 304 of the CRA. *Id.* It further informed Secretary Raffensperger that the statewide voter registration list could be produced via encrypted email or using the Department of Justice's secure file-sharing system. *Id.*

Secretary Raffensperger responded on December 8, 2025, citing state and federal privacy concerns, that he would not provide a copy of the SVRL including all fields. *See* Ex. 3 to Neff Decl. On December 18, 2025, the United States initially filed this action in the Middle District of Georgia. However, the District Court in the Middle District dismissed the case without prejudice after holding it lacked subject

matter jurisdictions because the SVRL and other responsive federal election records were located at Secretary Raffensperger's office in the Northern District of Georgia.[2] On January 23, 2026, the Attorney General instituted the action in this Court to initiate summary proceedings to compel production. *See* Compl., Doc. 1.

As explained in the attached declaration of Eric Neff, the United States seeks these documents for one purpose only: to evaluate Georgia's compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an enforcement action. Neff Decl. ¶ 2. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. Neff Decl. ¶ 3.

---

[2] *See United States v. Raffensperger*, case no. 5:25-cv-00548-CAR, slip op. at 7-8 (M.D. Ga. Jan. 23, 2026) (attached as Ex. 14 to Neff Decl.). The United States respectfully disagrees with that decision. The provision in 52 U.S.C. § 20705 is focused on "where" a case may be brought, not "whether" it may be brought, *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)—the tell-tale sign of a special venue provision. 14D Richard D. Freer, Federal Practice & Procedure § 3801 (4th ed.) ("[S]ubject matter jurisdiction addresses whether a dispute may be heard by a federal court at all. If so, venue then determines which federal court—usually meaning which federal district—should hear the case." (footnote omitted)).

## III.   THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA.

The elements of a demand for production of federal election records under the CRA are few and well-defined. First, the Attorney General must have made a written demand for federal election records stating the basis and purpose. 52 U.S.C. § 20703. Second, the demand must have been made to an officer of election, as that term is defined in Section 306 of the Act. 52 U.S.C. §§ 20703, 20706. Third, the officer of election must have failed or refused to make the demanded federal election records "available for inspection, reproduction, and copying." *Lynd*, 306 F.2d at 225-26; *see* 52 U.S.C. § 20703. Fourth, the Attorney General must have provided "a simple statement" to the Court where a production order is sought showing that these elements were satisfied. *Lynd*, 306 F.2d at 225-26. As discussed in Part II, the record demonstrates that the United States has met these requirements and is entitled to an order of production under Section 305 of the CRA.

In response, Defendants make several overlapping and duplicative arguments, all of which lack merit. Defendants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the motion to dismiss standard to it. Defendants incorrectly maintain that Title III of the CRA applies to investigation of only a narrow category of federal election laws. Defendants ask the Court to ignore controlling authority from this Circuit applying the CRA and allow an impermissible

8

challenge to the basis and purpose of the Attorney General's written demand. Likewise, Defendants assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Defendants invite the Court to narrow the mandate to encompass only redacted or publicly available records.[3] For the reasons discussed below, the Motions to Dismiss by Secretary Raffensperger (Doc. 16), Common Cause Intervenors (Doc. 22), and BMVF Intervenors (Doc. 23) should be denied, and the United States' Cross-Motion to Compel (Doc. 31) granted.

### A. The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.

Defendants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Def.'s Mot., Doc. 16-1 at 12; Common Cause Intervenors' Mot., Doc. 22-1 at 12-13; BMVF Intervenors' Mot., Doc. 23-1 at 9-10. They repeat what controlling authority from this Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records

---

[3] A "publicly available" record would never need to be "produced." The Attorney General would simply be able to access it in the same manner as any other member of the public. If that were the rule, CRA's provisions mandating production would essentially be rendered meaningless.

*before suit is filed.*" *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Defendants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[4] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election

---

[4] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing

11

other federal claims to which the Federal Rules of Civil Procedure do not apply).

A recent decision issued by a District Court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Defendants. *See United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, slip op at 14. (W.D. Mich. Feb. 10, 2026) (attached to Neff Decl. as Ex. 8). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *See* slip. op. at 14 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…" *Benson*, slip op. at 15. The court acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (citation omitted).

Two District Courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964) , to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *See United States v. Oregon*, Case No. 6:25-cv-01666-MTK, slip op. at 15 (D. Or. Feb. 5, 2026) (attached to Neff Decl. as Ex. 9); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, slip op. at 13 & n.15 (C.D. Cal. Jan.

12

15, 2026) (attached to Neff Decl. as Ex. 10).[5] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, slip. op. at 15 (quoting *Powell*, 379 U.S. at 58). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle

---

[5] Defendants cite extensively to *Weber* in their motion. *See* Def.'s Mot., Doc. 16-1; Common Cause Intervenors' Mot., Doc. 22-1; BMVF Intervenors' Mot., Doc. 23-1. As discussed below, *Benson* addressed many of the legal errors in *Weber* that call into question whether *Weber* merits any consideration.

a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even just because it wants assurance that it is not.*" *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC.[6]

In addition to *Powell*, the *Weber* court also referred to what it indicated was a

---

[6] The *Oregon* decision similarly misread *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, slip op. at 15 n.1. *Lynd* does not say filing a pleading waives the

decision of the United States Supreme Court. *See Weber*, slip op. at 13 (citing *Becker v. United States*, 451 U.S. 1306 (1981)). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available." *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)). Justice Rehnquist distinguished between agency efforts "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear

_____

expedited process under the CRA. Instead, as discussed above, *Lynd* explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

and justifies dispensing with Federal Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property). *Id.* at 1308, 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting Defendants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records. *Lynd*, 306 F.2d at 225-26; *see also Gallion*, 187 F. Supp. at 852 (same).

## B. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period

16

of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election …." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Secretary Raffensperger argues that the Court must ignore the text of the statute and find that Title III is limited to those records demanded when "there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights." Def.'s Mot., 16-1 at 17. The Intervenor-Defendants make similar arguments. *See* Common Cause Intervenors' Mot., Doc. 22-1 at 13; BVMF Intervenors' Mot., Doc. 23-1 at 13-14.

Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309

17

(prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion*, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated"). The United States clearly has satisfied that requirement by informing the officers of election that "the purpose of the request is to ascertain Georgia's compliance with the list maintenance requirements of the NVRA and HAVA." Ex. 2 to Neff Decl. at 2.

Intervenor-Defendants suggest that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Common Cause Intervenors' Mot., Doc. 22-1 at 1-2; BVMF Intervenors' Mot., Doc. 23-1 at 16. They are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021) (excerpts provided as Neff Decl., Ex. 11). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The

Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[7] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an

---

[7] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. Neff Decl. ¶¶ 17-18. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as Neff Decl., Ex. 12). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Neff Decl., Ex. 13).

enactment is clear, "'the words employed are to be taken as the final expression of the meaning intended' [by Congress]." *United States v. Lignarolo*, 770 F.2d 971, 979 (11th Cir. 1985) (quoting *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929)). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending

statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Defendants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," *Benson*, slip op. at 17, such as the NVRA and HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

## C. Defendants cannot challenge the Attorney General's basis and purpose to investigate Georgia's HAVA and NVRA compliance.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the August 14 Letter, the Attorney General made a written demand under Section 303 of the CRA for Georgia's federal election records, including its SVRL. For the basis, the letter began by referencing the NVRA and HAVA. Ex. 2 to Neff Decl. After explaining why those statutes supported the request, the letter specifically cited Section 303 of the CRA, stating that "[p]ursuant to the foregoing

authorities, including the CRA, the Attorney General is demanding an electronic copy of Georgia's complete and current [SVRL]." *Id.* It further explained that the purpose of the request "is to ascertain Georgia's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.*

Nevertheless, Defendants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. Def.'s Mot., 16-1 at 17-19; Common Cause Intervenors' Mot., Doc. 22-1 at 15-21; BVMF Intervenors' Mot., Doc. 23-1 at 14-17.

Federal courts have rejected contentions that parallel those made by Defendants. Defendants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law fails for the reasons discussed above. *See supra* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely the CRA, suffices.[8]

---

[8] Even if more of an explanation was required, to wit, why the records are needed, the Attorney General did so in her August 14 Letter, in which she wrote:

> [The] electronic copy of the [SVRL] should contain *all fields*, which means, [Georgia's SVRL] must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number [SSN4] as required under … HAVA … to register individuals for federal elections.

Similarly, as controlling authority that applies in this Circuit explains, Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating, "[t]he purpose of the request is to ascertain Georgia's compliance with the list maintenance requirements of the NVRA and HAVA." Ex. 2 to Neff Decl. at 2.

Contrary to what Defendants argue, authority that must be followed in this Circuit has made clear that officers of election are prohibited from using "any procedural device or maneuver," including Defendants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written

---

Ex. 2 to Neff Decl. at 1. An accompanying footnote explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that DOJ be able to conduct an independent review of each state's list…." *Id.* at n.1.

demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, slip op. at 16-17 ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Defendants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied in authority that is controlling in this Circuit. Therefore, their motions must be denied.

### D. Georgia's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude production of non-public records, as Secretary Raffensperger argues. *See* Def.'s Mot., Doc. 16-1 at 14 (arguing that the CRA does not preempt state privacy laws, which "mean[s] the DOJ cannot obtain the unredacted records under the CRA" and is only entitled to publicly available records). One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

27

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). *Lynd* likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that Secretary Raffensperger suggests.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL for a reason not raised by Secretary Raffensperger: that it applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." Slip op. at 18-19 (emphasis added). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[9] Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such

---

[9] According to the data that Georgia reported to the U.S. Election Assistance Commission, it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 162, 164 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Feb. 19, 2026).

"sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic…" Slip op. at 22. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*…" *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of voter registrations" encompassed by the Act. *Id*. at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F. Supp. 3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

29

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, slip op. at 22. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to the *Benson* court, "'*come* into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. Slip op. 19 (first emphasis added). That, however, is not what the plain terms of the statute dictate:  an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 1140 (8th coll. ed. 1960) (defining "possess" and "possession").  Secretary Raffensperger acquired the relevant records in the course of carrying out his duties as an officer of election.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains

possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of:  acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court, then, "distinction[s] between possessing something and having something come into one's possession," slip op. 19, are temporal distinctions—not distinctions between obtaining records from an outside

31

source and through self-generation—as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary Raffensperger's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and

preserve" it. 52 U.S.C. § 20701. And Secretary Raffensperger, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

Finally, this construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[10] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the

---

[10] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The parties filed a joint motion to enter the consent decree. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Feb. 19, 2026). For the Court's convenience, the three documents are provided herein as Neff Decl., Exs. 4-7.

electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* Neff Decl. ¶ 4. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

### E. The United States is entitled to unredacted "reproduction" and "copying" of Georgia's federal election records, including its SVRL.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. As controlling authority that applies in this Circuit explains, the question is only "open for determination" by the Court if "a genuine dispute … arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Defendants ask the Court to legislate limitations conspicuously absent from Title III. Secretary Raffensperger cites state and federal statutes governing privacy of voter registration records to support his argument that only a

publicly available version of Georgia's SVRL is required. *See* Def.'s Mot., Doc. 16-1 at 13-14, 19. Intervenor-Defendants make similar arguments. *See* Common Cause Intervenors' Mot., Doc. 22-1 at 3-4; BVMF Intervenors' Mot., Doc. 23-1 at 17-21. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Defendants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to "all records and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent

confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Georgia's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Defendants that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[11] *Lynd*, 306 F.2d at 230.

Finally, if the Defendants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter, that includes their driver's license number, their SSN4, or other HAVA identifying number. *See*

---

[11] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Neff Decl. ¶ 21. As of February 17, 2026, thirteen states have provided their SVRLs without any MOU. *Id.* Two states have agreed to provide their SVRL under the terms of the MOU. *Id*. Three other states have indicated their intention to provide the SVRLs in the near future. *Id*.

52 U.S.C. § 21083(a)(5)(A). As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[12] *See supra* Part III(B). There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

The data the United States has requested under the CRA is the same that twenty-five states (including Georgia) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[13] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See*

---

[12] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[13] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 19, 2026).

*Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at
*2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New
Hampshire statewide voter database and all documents concerning the use of the
statewide voter database, including instruction manuals or other guides concerning
the data fields contained in the database and their correct interpretation."), *appeal
dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of
Georgia's unredacted electronic SVRL under the unambiguous language of Section
303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56
(granting the Attorney General "an order to require the production of records for
inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

## IV.    THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS

Defendants make a variety of arguments that privacy laws require dismissal
of the United States' efforts to compel production of Georgia's federal election
records. *See* Def.'s Mot., Doc. 16-1 at 13-16, 19-22; Common Cause Intervenors'
Mot., Doc. 22-1 at 21-24; BVMF Intervenors' Mot., Doc. 23-1 at 21-25. Those
arguments are misguided at best. The United States does not dispute that the
requirements of the Privacy Act and Section 304 of the CRA apply here, and it is
complying with those requirements. Neither statute prohibits the collection of voter

information by the United States to assess compliance with HAVA and the NVRA. The requirement for a Privacy Impact Assessment under the E-Government Act does not apply to the investigation of Georgia's list maintenance practices being conducted by the United States under HAVA and the NVRA. Likewise, the Driver's Privacy Protection Act does not limit the United States' ability to conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

### A. The United States is complying with the Privacy Act.

Secretary Raffensperger argues that the United States must comply with the Privacy Act, and the United States is doing just that. But Secretary Raffensperger goes even further, contending that the Complaint must be dismissed because the United States "never identifies a [systems of records notice] SORN in its Complaint" to show compliance of the Act. Def.'s Mot., Doc. 16-1 at 20. Not surprisingly, however, there is no requirement in federal law that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the Attorney General is collecting is maintained according to the Privacy Act protections explained in the Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this

collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's SORNs, most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148-24,151.

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960. *See* Privacy Policy, *supra* n.16. The United States made its requests pursuant to those statutes. *See* Exs. 1-2 to Neff Decl. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what Intervenor-Defendants contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not intended "to create a national voter database, and to otherwise use untested forms of database matching to scrutinize state voter rolls – in short, as part of efforts to nationalize elections." Common Cause Intervenors' Mot., Doc. 22-1 at 5; *see also* BVMF Intervenors' Mot., Doc. 23-1 at 6 (arguing the federal government "intends to share the voter lists across the federal government and use the data for immigration enforcement, to push for voter purges, and to cast doubt on the legitimacy of U.S. elections."). Rather, the records sought from Georgia are necessary to perform an individualized assessment of the State's efforts to comply

40

with HAVA and the NVRA.[14] Neff Decl. ¶ 5. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

To the extent that Secretary Raffensperger is concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

Moreover, the Privacy Act does not bar the disclosure of Georgia's SVRL to the United States, as Secretary Raffensperger contends. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the

---

[14] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. Neff Decl. ¶ 6.

Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Secretary Raffensperger to fail to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

### B. The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.

Secretary Raffensperger next argues that the demand for production of Georgia's SVRL and other federal election records violates the E-Government Act. According to Secretary Raffensperger, the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* Def.'s Mot., Doc. 16-1 at 21. Again, neither the E-Government Act nor interpretative caselaw support Secretary Raffensperger's assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any

information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Secretary Raffensperger to provide a voter registration list Georgia already maintains pursuant to federal law to analyze its federally required list maintenance.

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act (UOCAVA). Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208 (a).

Even if the Court found the E-Government Act applied here—and it should not—Secretary Raffensperger has misplaced his reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ("EPIC I"). *See* Def.'s Mot., Doc. 16-1 at 21. *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In that case, the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the

43

E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ("EPIC II"). In doing so, the *EPIC II* court explained that the Act "is intended to protect individuals—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind." *Id*. at 378 (emphasis in original).

### C. The Driver's Privacy Protection Act does not allow Secretary Raffensperger to deny the United States list maintenance data.

Secretary Raffensperger's contention that dismissal is warranted because he alleges that the United States' request violates the Driver's Privacy Protection Act ('DPPA')," likewise fails. Def.'s Mot., Doc. 16-1 at 21-22. Secretary Raffensperger even goes so far as to state that "The DOJ does not need the confidential information of Georgia voters to assess whether Georgia is conducting list maintenance." *Id*. at 22. Congress disagreed when it gave the Attorney General exclusive authority to enforce Section 303 of HAVA and to bring enforcement actions under Section 8 of the NVRA. It is true that the DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under

18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in 18 U.S.C. § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

## V.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the United States' Cross-Motion to Compel (Doc. 31), deny Defendants' Motions to Dismiss (Docs. 16, 22, 23) and enter an order compelling production of Georgia's SVRL and other responsive federal election records.

DATED: February 19, 2026               Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ *Brittany E. Bennett*
BRITTANY E. BENNETT
GA Bar No. 717377
CHRISTOPHER J. GARDNER
GA Bar No. 163932
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 812-2631
Email: Christopher.Gardner@usdoj.gov
Email: Brittany.Bennett@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1 (D), the undersigned hereby certifies that the foregoing brief was prepared in Times New Roman, a font type selection approved by the Court in L.R. 5.1(B).

/s/ *Brittany E. Bennett*
BRITTANY E. BENNETT

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*

BRITTANY E. BENNETT
CHRISTOPHER J. GARDNER
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: Christopher.Gardner@usdoj.gov
Email: Brittany.Bennett@usdoj.gov

48