**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State for the State of Georgia, <br><br> Defendant. | No. 1:26-cv-485-ELR |

**INTERVENOR-DEFENDANTS COMMON CAUSE AND ROSARIO PALACIOS' OPPOSITION TO THE UNITED STATES' MOTION TO COMPEL AND REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

INTRODUCTION .........................................................................................................1

ARGUMENT .................................................................................................................2

    I.  The DOJ Is Not Entitled to Summary Proceedings.....................................2

    II.  The Complaint Fails to State A Claim Under Title III, Because It
        Does Not Adequately Plead that the DOJ Has Provided A
        Written Statement of the Actual Basis and Purpose of its Request.........11

    III. Nothing in Title III Entitles the DOJ to Unredacted Records..................18

CONCLUSION..............................................................................................................24

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................15

*Coalition for Open Democracy v. Scanlan*,
   No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025) ............................ 20

*Coleman v. Kennedy*,
   313 F.2d 867 (5th Cir. 1963) .............................................................................. 6, 13

*Davila v. Gladden*,
   777 F.3d 1198 (11th Cir. 2015) ................................................................................15

*Department of Commerce v. New York*,
   588 U.S. 752 (2019) .................................................................................................17

*Donaldson v. United States*,
   400 U.S. 517 (1971) ...................................................................................................4

*Federal Trade Commission v. Kujawski*,
   298 F. Supp. 1288, 1290 (N.D. Ga. Apr. 3, 1969) ...................................................4

*Fuerst v. Housing Authority of City of Atlanta, Georgia*,
   38 F.4th 860 (11th Cir. 2022) ..................................................................................11

*HA&W Wealth Management, LLC v. United States Department of Labor,*
   *Employee Benefits Security Administration*,
   No. 1:16-cv-4446-RWS-RGV, 2017 WL 11113756 (N.D. Ga. Feb. 8, 2017) ........... 4

*Holland v. Carnival Corp.*,
   50 F.4th 1088 (11th Cir. 2022) ................................................................................15

*In re Coleman*,
   208 F. Supp. 199 (S.D. Miss. 1962) ..................................................................... 6, 8

*Johnson v. White*,
   989 F.3d 913 (11th Cir. 2021) ...................................................................................3

*Judicial Watch v. Lamone*,
  399 F. Supp. 3d 425 (D. Md. 2019)..........................................................................20

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ..............................................6, 8, 9, 10, 19, 24

*National Labor Relations Board v. SW General, Inc.*,
  580 U.S. 288 (2017)........................................................................................3, 13

*Paez v. Secretary, Florida Department of Corrections*,
  947 F.3d 649 (11th Cir. 2020) ...................................................................15

*Polselli v. IRS*,
  598 U.S. 432 (2023)........................................................................................4

*Public Interest Legal Foundation v. Benson*,
  136 F.4th 613 (6th Cir. 2025)...................................................................14

*Public Interest Legal Foundation v. Benson*,
  2026 WL 568298 (U.S. Mar. 2, 2026)........................................................14

*Seaboard System Railroad v. Interstate Commerce Commission*,
  827 F.2d 699 (11th Cir. 1987) ......................................................................6

*Securities and Exchange Commission v. ESM Government Securities, Inc.*,
  645 F.2d 310 (5th Cir. Unit B May 1981)....................................................6

*United States ex rel. Osheroff v. Humana, Inc.*,
  776 F.3d 805 (11th Cir. 2015) ...................................................................15

*United States v. Benson*,
  No. 1:25-cv-1148-HYJ-PJG,
  2026 WL 362789 (W.D. Mich. Feb. 10, 2026).......................2, 4, 6, 19, 20

*United States v. Kabakibou, MD, PC*,
  522 F. Supp. 3d 1307 (N.D. Ga. 2020) ......................................................4

*United States v. Moss*,
  34 F.4th 1176 (11th Cir. 2022).................................................................15

*United States v. Oregon,*
   No. 6:25-cv-1666-MTK,
   2026 WL 318402 (D. Or. Feb. 5, 2026) .................................................2, 7, 12, 17, 18

*United States v. Powell,*
   379 U.S. 48 (1964)..................................................................................................4, 5, 12

*United States v. Ward,*
   667 F. Supp. 3d 1150 (N.D. Ga. 2023) .......................................................................4

*United States v. Weber,*
   No. 2:25-CV-9149-DOC-ADS,
   2026 WL 118807 (C.D. Cal. Jan. 15, 2026)...................................2, 5, 10, 12, 15, 17

*Watts v. Joggers Run Property Owners Association, Inc.,*
   133 F.4th 1032 (11th Cir. 2025)...............................................................................15

**Statutes**

18 U.S.C. § 2721 .............................................................................................................8

26 U.S.C. § 7604(a) .......................................................................................................5

26 U.S.C. § 7609 ............................................................................................................4

26 U.S.C. §7605(b) ........................................................................................................5

44 U.S.C. § 3351 ............................................................................................................8

52 U.S.C. § 20507(a)(4)...........................................................................................13, 14

52 U.S.C. § 20507(i)(1).................................................................................................20

52 U.S.C. § 20701 ........................................................................................................19

52 U.S.C. § 20703 ...................................................................................................11, 15

52 U.S.C. § 20704 ........................................................................................................22

52 U.S.C. § 20705 ....................................................................................................3, 5, 6

52 U.S.C. § 21083(a)(2)(A).....................................................................................13, 14

52 U.S.C. § 21085 ..........................................................................................................14

E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 (2002)..............................................................8

Official Code of Georgia Annotated § 21-2-225 .........................................................19

Privacy Act of 1974,
    Pub. L. No. 93-579, 88 Stat. 1896 (1974)...................................................................8

**Rules**

Federal Rules of Civil Procedure,
    Rule 1...............................................................................................................................3

Federal Rules of Civil Procedure,
    Rule 26............................................................................................................................10

Federal Rules of Civil Procedure,
    Rule 81.........................................................................................................................3, 4

Federal Rules of Evidence,
    Rule 801(d)(2)..............................................................................................................16

**Other Authorities**

*Analyzing DOJ's MOU for Voter Registration List Data for FISMA Compliance*,
    Electronic Privacy Information Cemter (Feb. 2026),
    https://epic.org/documents/analyzing-dojs-mou-for-voter-
    registration-list-data-for-fisma-compliance/ ......................................................23

Election Registration Information Center,
    *Technology & Security Overview* (Sept. 29, 2025),
    https://perma.cc/H8YU-MCB7.................................................................................21

Lisa Danetz, *The Justice Department's Security Measures for Collecting Voter
    Rolls Are Inadequate*,
    Brennan Center for Justice (Feb. 25, 2026), https://perma.cc/4WSD-
    DJKU .............................................................................................................................23

Press Release, United States Department of Justice,
*Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY ............................................. 16

Steven F. Lawson,
*Black Ballots: Voting Rights in the South, 1944-1969* (1976) ..................................... 9

U.S. Election Assistance Commission,
*Availability of State Voter File & Confidential Information* (updated Oct. 29, 2020), https://perma.cc/S738-DGG4 .................................................................. 19

**INTRODUCTION**

In its opposition to the motions to dismiss, the Department of Justice ("DOJ") does not identify any proper basis or purpose for its unprecedented request for Georgia's complete and unredacted voter registration list—let alone "the basis" and "the purpose" required by Title III of the Civil Rights Act of 1960 ("CRA"). Nor does it offer any explanation as to why, even if production were appropriate, redactions are not permissible to protect Georgia voters' sensitive personal information, as is common with productions under analogous provisions of the National Voter Registration Act ("NVRA"). Instead, the DOJ attempts to short-circuit the motions to dismiss and moves to compel production immediately, insisting that bedrock procedural protections of the Federal Rules of Civil Procedure do not apply.

None of this is required by the CRA. Notwithstanding the DOJ's characterizations, the landmark civil rights law exists to protect the right to vote, not to undermine that right by disseminating voters' confidential information for questionable (at best) purposes. And Title III imposes meaningful requirements on the federal government when the DOJ makes a records request and creates a key role for courts to oversee compliance with the CRA.

Other courts that have adjudicated the DOJ's recent requests for states' voter registration lists have uniformly rejected them, dismissing materially-identical

complaints without allowing leave to replead. *See United States v. Weber*, No. 2:25-CV-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-cv-1148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026). This Court should do the same, by denying the motion to compel and dismissing the Complaint.

## ARGUMENT

### I.     The DOJ Is Not Entitled to Summary Proceedings.

In its brief, the DOJ asserts that key procedural protections of the Federal Rules of Civil Procedure—in particular, scrutiny of the pleadings under Rule 12—do not apply to requests for production under Title III. *See* United States' Consol. Mem. in Supp. of Its Cross-Mot. to Compel and in Opp. to Mots. to Dismiss ("Opp.") at 8-9, Dkt. No. 31-1. Title III says nothing of the sort, and binding precedent and the Federal Rules themselves are to the contrary. "There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place." *Oregon*, 2026 WL 318402, at *8; *accord Weber*, 2026 WL 118807, at *8 ("Title III cannot transform an election records request by the federal government from an ordinary civil action

2

into an action comparable to an order to show cause."). The Federal Rules govern this proceeding, which the United States chose to initiate as a traditional civil action by filing a Complaint.

Start with the text. Title III provides that when the Attorney General makes a demand for voting-related records or papers, the federal district court where such demand is made "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). This "appropriate process" is set forth in the Federal Rules of Civil Procedure, which "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules explicitly provide for limited and narrow carveouts to their own application, none of which include claims under Title III. *See* Fed. R. Civ. P. 81; *see also Johnson v. White*, 989 F.3d 913, 918 (11th Cir. 2021) (describing the *expressio unius* canon, pursuant to which "the inclusion of 'one item of an associated group or series excludes another left unmentioned'") (quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (brackets omitted))). Indeed, Rule 81 affirmatively states that the Rules *do* apply in "proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute . . . ." Fed. R. Civ. P. 81(a)(5).[1]

---

[1] This is why *Benson* was incorrect to suggest in dicta that "most of the Federal

Binding precedent confirms this plain-language reading. The Supreme Court has held that the Federal Rules of Civil Procedure apply to summonses. *See Donaldson v. United States*, 400 U.S. 517, 528 (1971) ("The Civil Rules, of course, do have an application to a summons proceeding." (citing Fed. R. Civ. P. 81)), *superseded by statute*, 26 U.S.C. § 7609, *on unrelated grounds*. Indeed, shortly after the enactment of Title III — and after the bulk of caselaw upon which the DOJ relies — the Court held that proceedings under a statutory grant of authority to compel production of records were governed by the Federal Rules and that the government bore the burden to establish the statutory requirements prior to enforcement. *See United States v. Powell*, 379 U.S. 48, 57–58 (1964). *Powell* explained that "the Federal Rules of Civil Procedure apply," precisely because the statute at

---

Rules of Civil Procedure are simply inapplicable to the enforcement of an administrative subpoena." 2026 WL 362789, at *7 (internal quotation marks omitted). Whether or not this is correct as a matter of Sixth Circuit precedent, *see id.*, courts in this District apply the Federal Rules in actions seeking to compel production of documents pursuant to a federal administrative subpoena. *See, e.g., United States v. Ward*, 667 F. Supp. 3d 1150, 1172 (N.D. Ga. 2023) (applying Rule 72, regarding the standard of review district courts use for magistrate judges' decisions in an action to enforce an NLRB subpoena); *United States v. Kabakibou, MD, PC*, 522 F. Supp. 3d 1307, 1309 (N.D. Ga. 2020) (same, for DOJ subpoena under the False Claims act); *HA&W Wealth Mgmt., LLC v. U.S. Dep't of Labor, Emp. Benefits Sec. Admin.*, No. 1:16-cv-4446-RWS-RGV, 2017 WL 11113756, at *1 (N.D. Ga. Feb. 8, 2017) (same, for Department of Labor subpoena); *see also FTC v. Kujawski*, 298 F. Supp. 1288, 1290–91 (N.D. Ga. Apr. 3, 1969) (allowing discovery prior to enforcement of subpoenas).

issue "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction." *Id.* at 58 n.18. The IRS statute at issue in *Powell* is materially identical to Title III. *Compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data." (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper." (emphasis added)); *see also Weber*, 2026 WL 118807, at *8 n.15 (explaining *Powell*'s holding "that courts should apply standard civil procedures in ensuring [statutory] prerequisites are satisfied under a similarly worded statute").

The DOJ resists the impact of *Powell* by noting that the Internal Revenue Code bars the IRS from subjecting taxpayers "to unnecessary examination or investigations," 26 U.S.C. §7605(b), while Title III does not contain analogous language. Opp. at 13–14. However, a *substantive* prohibition contained elsewhere in the Internal Revenue Code has nothing to do with the "appropriate *process*" relevant to requests under Title III. 52 U.S.C. § 20705 (emphasis added). And any argument that *Powell* is distinguishable because it only applies to IRS subpoenas, as opposed to other administrative subpoenas, is also foreclosed by binding

Circuit precedent, which has applied the *Powell* framework to cases involving administrative subpoenas issued by agencies other than the IRS. *See, e.g., Seaboard Sys. R.R. v. ICC*, 827 F.2d 699, 702 (11th Cir. 1987); *SEC v. ESM Gov't Secs., Inc.*, 645 F.2d 310, 313 n.3 (5th Cir. Unit B May 1981) ("*Powell* . . . involved enforcement of an IRS summons . . . . It is generally agreed, however, that the principles . . . apply to SEC subpoenas as well." (citations omitted)).

Moreover, Title III does contain substantive limitations. For one, only some types of records are subject to disclosure. *See Benson*, 2026 WL 362789, at *9–11 (holding that a statewide voter registration file is not a record within the scope of Title III, because it is not one that "comes into" the possession of elections officials). Courts have also recognized that disclosure is inappropriate where "the purpose is speculative, or from idle curiosity." *See In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). Finally, because Title III authorizes jurisdiction by "appropriate process" to compel production, 52 U.S.C. § 20705, such process would "no doubt . . . include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information. *Kennedy v. Lynd*, 306 F.2d 222, 230 (5th Cir. 1962).

Which brings us to *Lynd*: The United States relies primarily on *Lynd* and other cases from more than sixty years ago and does not point to any more recent caselaw supporting its position on summary proceedings. *E.g.,* Opp. at 2–3, 8–11.

6

The United States' reliance on *Lynd* and similar cases for their discussion of the appropriate procedural treatment of a records request under Title III is misplaced for multiple reasons.

First and foremost, these cases were decided before the Supreme Court decided *Powell*, which superseded *Lynd*. *See Oregon*, 2026 WL 318402, at *8 ("[T]he Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*.").

For another, the United States affirmatively chose to commence this action by filing a Complaint. *See* Compl., Dkt. No. 1. The United States invoked the Rules to initiate this litigation and to defend its pleadings elsewhere, and cannot now disclaim those choices because the results proved unfavorable. *See Oregon*, 2026 WL 318402, at *8 n.1 ("Even if *Lynd* applied here, the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation. By contrast, *Lynd* appears to contemplate an application directly to the court for the records.").

Nor is the information sought here at all analogous to the data requests at issue in *Lynd* and the other early cases the DOJ cites. Those cases were decided before states began collecting sensitive personal identifying information, such as a Social Security number or driver's license number, to include in a voter's registration record, and before the passage of landmark federal statutes protecting

7

such information.[2] Even then, *Lynd* explicitly noted that the records at issue were not sensitive or private. 306 F.2d at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection . . . ."); *see also In re Coleman*, 208 F. Supp. at 200 (noting multiple considerations not at issue in that case but which could be "[s]ignificant[]" in a Title III request, including claims "that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). And, as noted, *Lynd* itself recognized that courts may have the obligation to issue protective orders in the appropriate case under Title III—such as an order requiring the redaction of sensitive voter information. *Lynd,* 306 F.2d at 230; *see also In re Coleman*, 208 F. Supp. at 201 (noting "exception[s]" to "[t]he right of free examination of official records" due to improper purpose).

Crucially, *Lynd* and the United States' other Fifth Circuit cases emerged out of a radically different context. *Lynd* was decided by the Jim Crow-era Fifth Circuit,

---

[2] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), *codified at* 18 U.S.C. §§ 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), *codified at* 44 U.S.C. §§ 3351 *et seq.* (2014).

8

which covered jurisdictions where election officials openly used every possible means to block Black Americans from registering to vote. *See generally*, *e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976). Congress enacted Title III to facilitate discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. *Lynd*, 306 F.2d at 228 ("[Title III's] purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101 pattern-or-practice] suits or similar actions should be instituted. And it is to enable him to obtain such evidence for use in such cases if and when filed."). By the time *Lynd* was decided, the county registrar defendants had already spent eighteen months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Id.* at 227.

It was against this backdrop of open, explicit discrimination and prolonged abuse of the judicial process that the Fifth Circuit noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Id.* at 226 (internal citation omitted). In that context, "the factual

9

foundation for" the basis and the purpose of the Attorney General's request was self-evident, and plenary consideration thus not required. *See id.* That court's treatment of the CRA cannot be divorced from its context. By contrast, here, more than sixty years later, the context of *this* request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive personal information.

After choosing to file a Complaint in accordance with the Federal Rules, the United States attempts to get out from under the consequences. It relies on *Lynd*—which did not concern the sensitive voter information of the type at issue here and emerged from a radically different procedural and factual context—to insist it is entitled to summary relief without *any* review of its statutorily required stated basis and purpose. *But see id.* at 225 (noting the "vital" role courts play in a request under Title III). Under the Rules' plain text and binding precedent, this flouts the law. "Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures." *Weber*, 2026 WL 118807, at *8. Because the Rules apply, the Complaint must survive scrutiny under Rule 12—which it does not.[3]

---

[3] In addition to Rule 12, the Rules' provisions for discovery could end up being highly relevant here. *See generally* Fed. R. Civ. P. 26. If the case is not dismissed, discovery will be particularly important for this application under Title III because

**II.     The Complaint Fails to State A Claim Under Title III, Because It Does Not Adequately Plead that the DOJ Has Provided A Written Statement of the Actual Basis and Purpose of its Request.**

Title III requires the DOJ to include "a statement of the basis and the purpose" of its request along with any document demand. 52 U.S.C. § 20703. Rather than defend its paltry attempt to meet this requirement, the DOJ argues that its statement of the basis and purpose of its request is not subject to any form of judicial scrutiny. *See* Opp. at 23. This is incorrect, and the shifting, conclusory, and pretextual statements the DOJ offers are patently inadequate.

As to the basis for the request, the DOJ claims that "a reference to the statutory basis for making the demand, namely the CRA, suffices." Opp. at 24. This argument would functionally erase a statutory requirement: If invoking the CRA was a sufficient basis for a request made under the CRA, then there would be no point in mandating that the DOJ include a statement of its basis. The requirement would, by definition, always be satisfied. *See Fuerst v. Housing Auth'y of City of Atlanta, Ga.*, 38 F.4th 860, 869 (11th Cir. 2022) ("[T]he surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a clause, sentence, or word superfluous, void, or

---

of the compelling evidence that the DOJ's stated purpose is pretextual—meaning it has not provided a statement of *the* basis and *the* purpose for its request. *See* Section II.

insignificant." (cleaned up)). Instead, to satisfy the basis requirement of the CRA, the DOJ must articulate "a factual basis for investigating a violation of federal statute." *Oregon*, 2026 WL 318402, at *9; *accord Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *see also* Br. in Supp. of Mot. to Dismiss of Intervenor-Defendants Common Cause & Rosario Palacios ("MTD Br.") at 14–15, Dkt. No. 22-1 (explaining the basis and purpose requirements).

The DOJ attacks a strawman, arguing against the idea that only a statement of facts conclusively establishing a violation of federal law satisfies the basis requirement. *See* Opp. at 24. This misrepresents Intervenor-Defendants' argument: The DOJ does not need to prove its case prior to investigating it, but it must provide some factual basis to assure a court that it is not engaged in an impermissible "fishing expedition." *Weber*, 2026 WL 118807, at *9. This is also why *Powell*'s statement that the government may issue an investigative demand "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," 379 U.S. at 57 (internal quotation marks omitted), is not the silver bullet the DOJ pretends it is. *See* Opp. at 14. Title III obligates the DOJ to provide a statement of its basis and purpose in requesting records; it is hard to see why Congress would include this requirement if it imposed no barrier whatsoever

12

to the DOJ's requests. Instead, if the federal government demands records because it wants to assure itself that a state or local government is not violating federal law, it must still articulate why it has some quantum of suspicion otherwise. The DOJ's request here conspicuously fails to do so.[4]

As for its purpose, the DOJ states that it has "one purpose only: to evaluate Georgia's compliance with the list maintenance provisions of HAVA and the NVRA." Opp. at 7. Even assuming this is the case, the DOJ does not provide any reason to think the requested records would help it do so. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters," 52 U.S.C. § 20507(a)(4), and HAVA requires states to "perform list maintenance . . . on a regular basis" in accordance with the NVRA, *id.* § 21083(a)(2)(A). Both laws delegate the mechanisms for list maintenance to the

---

[4] *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (per curiam), does not change this analysis. *But see* Opp. at 25. There, the Court affirmed a decision below on the basis of *Lynd*, and then additionally quoted an individual legislator speaking on the Senate floor about the requirements of Title III. *Id.* at 868. *Coleman*'s discussion was arguably dicta, as the legislative history was offered to support the reading of Title III already adopted in *Lynd*, and *Coleman* did not discuss the application of the principles articulated to the case at issue. *Id.* And the Supreme Court has subsequently clarified that "floor statements by individual legislators rank among the least illuminating forms of legislative history." *SW General, Inc.*, 580 U.S. at 307. In any event, even if the legislator's statements are treated as binding, the DOJ has not "identif[ied] in a general way the reasons for [its] demand" because there is not a shred of evidence—or even any assertion—of any "possible violations of a Federal statute" on the part of Georgia. *Coleman*, 313 F.2d at 868. Instead, evidence overwhelmingly suggests that in reality "the reasons for [its] demand" have nothing to do with the NVRA and HAVA.

13

states. *See id.* § 20507(a)(4), (c)(1); § 21083(a)(2)(A); § 21085. The requested records—the complete and unredacted voter file—would not allow the DOJ to evaluate Georgia's compliance with these laws, because the file reflects just one point in time. Even if the DOJ identified voters who could permissibly be removed under the NVRA, their mere presence on the list of registered voters would not suggest that Georgia failed to comply with federal law. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" which "need not be perfect, or even optimal, so long as it remains within the bounds of rationality"), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026). Nor does the DOJ provide any explanation as to why it needs an *unredacted* version of the voter file or any justification for the intrusion on voters' privacy.[5]

All of this would be perplexing, were it not for the evidence of the actual intent behind the DOJ's data requests. The DOJ's conclusory explanations are contradicted by a massive and growing body of judicially-noticeable evidence regarding what is actually afoot. This Court "is not obliged to accept a contrived

---

[5] The DOJ also wildly mischaracterizes Intervenor-Defendants' argument as having suggested that HAVA's identification requirements conflict with the right to vote. *See* Opp. at 19. Intervenor-Defendants object to the federal government's misuse of voter data, provided to states pursuant to HAVA, to engage in voter purges and baseless challenges to election results—not to the requirement that states collect such information at all.

14

statement and purpose" for a records request under Title III, *Weber*, 2026 WL 118807, at *10, because the statute requires a statement of "*the* basis and *the* purpose of the request." 52 U.S.C. § 20703 (emphasis added). The United States' Complaint should be dismissed for this additional reason.

In adjudicating a motion to dismiss, this court may "draw on its judicial experience and common sense" to determine if the DOJ's statements about the basis and the purpose of its request are—or are not—"plausible." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In doing so, this Court need not blind itself to reality. When considering a motion to dismiss, this Court "may consider matters of which a court may take judicial notice." *Watts v. Joggers Run Property Owners Ass'n, Inc.*, 133 F.4th 1032, 1036 n.3 (11th Cir. 2025) (internal quotation marks omitted). These include publicly filed documents, *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015), other court dockets, *Paez v. Sec'y, Fla. Dep't of Corrs.*, 947 F.3d 649, 651 (11th Cir. 2020), and government documents that are available to the public, *Davila v. Gladden*, 777 F.3d 1198, 1207 n.3 (11th Cir. 2015); *United States v. Moss*, 34 F.4th 1176, 1181 n.3 (11th Cir. 2022). *See also Watts*, 133 F.4th at 1036 n.3 (noting the "wide discretion" that a court enjoys as to what matters to judicially notice).

The DOJ does not meaningfully contest any of the evidence that Intervenor-Defendants presented in their opening brief, instead claiming that only "third-party hearsay" supports the idea that there is anything untoward about its request. Opp. at 40. However, it is a matter of public record that the DOJ has sued dozens of states and the District of Columbia, seeking their unredacted voter files—up to thirty as of the filing of this brief. *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY. And, rather than hearsay, it is the DOJ's own actions and statements that undercut its representations. *Cf.* Fed. R. Evid. 801(d)(2). It is the DOJ that admitted in a recent court filing to sharing state voter-roll information with election advocacy groups for purposes of identifying (non-existent) voter fraud and contesting election results. *See* MTD Br. at 8. It is the DOJ that acknowledges that it has been pressuring states into signing memoranda of understanding that would straightforwardly violate federal law. *See* Decl. of Eric Neff ¶ 21, Dkt. No. 31-2; MTD Br. at 9–11, 20. It was *the Attorney General herself* who wrote to Minnesota's governor tying "Operation Metro Surge"—which involves well-documented abuses by United States Immigration and Customs Enforcement against the civilian population in the state—with, among other things, Minnesota's refusal to turn over its unredacted voter file. *See* MTD Br. at 11–12, 20–21. And it was the President of the United States who announced his desire to "nationalize"

16

elections in certain states: "The Republicans should say, 'We want to take over,'" he said. *Id.* at 8–9."We should take over the voting, the voting in at least many—15 places. The Republicans ought to nationalize the voting." *Id.* at 9. None of this is hearsay, and the United States does not have an answer for any of it. This evidence and the Complaint's conclusory allegations prove the kind of "significant mismatch" between stated and actual reasons that the Supreme Court has held that courts need not accept. *Dep't of Com. v. New York*, 588 U.S. 752, 755, 785 (2019) (rejecting agency's "contrived" justification and refusing to "exhibit a naiveté from which ordinary citizens are free").

Consequently, federal courts in *Weber* and *Oregon*, considering the same contrived arguments that Plaintiff puts forward in this case, reached the inevitable conclusion: "It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 2026 WL 118807, at *10. The court in *Oregon* found that "[t]he presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *Oregon*, 2026 WL 318402, at *11. The court noted that despite the United States' "Oregon-specific concerns about voter list maintenance . . . Plaintiff has in fact requested the same statewide voter registration lists in states across the country." *Id.* The same is true in Georgia. And

17

specifically in regard to Attorney General Bondi's letter to the Minnesota Governor, the court found that "[t]he context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Id.*[6]

Contra the DOJ's suggestion, this Court plays a vital role under Title III, and must determine whether the Complaint provides a sufficient—*and truthful*—statement of the basis and the purpose of the United States' request. It does not.

## III.   Nothing in Title III Entitles the DOJ to Unredacted Records.

Even if the DOJ had established its entitlement to any records under Title III—which it has not—production should still be made subject to a protective order requiring redaction of sensitive voter information.

As noted, Congress enacted Title III when voter registration did not include sensitive personal information and prior to the enactment of landmark federal privacy legislation. *See* Section I. It therefore makes sense that contemporaneous case law treated the subject documents as "public records which ought ordinarily to be open to legitimate reasonable inspection" rather than "confidential, private

---

[6] While the court in *Oregon* did not explicitly cite President Trump's recent calls to "nationalize" elections, it did also note that Plaintiff's attempt to usurp states' role in election regulations "disturb[s] the framework of federalism envisioned and enshrined in our Constitution." *Oregon*, 2026 WL 318402, at *13.

papers and effects." *Lynd*, 306 F.2d at 231.

The DOJ resists this, claiming that for Title III to have any meaning, it must encompass unredacted and/or non-public records. *See* Opp. at 9 & n.3. Relatedly, the DOJ argues that Title III's privacy protections, *see* 52 U.S.C. § 20704, only make sense if the records covered contain non-public information. *See* Opp. at 35. Even assuming that a state's voter file is encompassed by Title III, *but see Benson*, 2026 WL 362789, at *9–11, states vary widely in whether those files are available to all members of the public, whether a fee to access those files applies, and what data is included. *See* U.S. Election Assistance Comm., *Availability of State Voter File & Confidential Information* (updated Oct. 29, 2020), https://perma.cc/S738-DGG4. Although Georgia makes such records available as matter of state law, *see* O.C.G.A. § 21-2-225, other states do not. It is therefore not the case that the DOJ must be given complete, unredacted voter lists for Title III to have any force.

To oppose reasonable redactions of sensitive voter information, the DOJ hangs its hat on the language of "all records and papers" contained in Title III. *See* Opp. at 36 (quoting 52 U.S.C. § 20701). But a document can both be a covered "record" subject to disclosure under federal election laws and be produced with appropriate redactions. Elsewhere in its brief, the DOJ emphasizes that voter registration lists are records for purposes of Section 8(i) of the NVRA, which obligates elections officials to retain and produce certain voter registration

19

"records," 52 U.S.C. § 20507(i)(1). *See* Opp. at 29 (citing *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 434 (D. Md. 2019)). Leaving aside whether voter registration files are records that "come into" elections officials' possession for purposes of Title III, *but see Benson*, 2026 WL 362789, at *9–11, the DOJ's comparison is apt for a different reason. As documented in Intervenor-Defendant's opening brief, Section 8(i) of the NVRA is silent as to how to treat sensitive personal information, just like Title III, and cases interpreting it have consistently required officials to preserve the right to vote through careful redactions. *See* MTD Br. at 22–24.

The DOJ also asserts that private parties have been given "even more detailed voter data" than it requests here, specifically in *Coalition for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025). *See* Opp. at 37–38. *Scanlan* is a challenge to a New Hampshire law requiring proof of citizenship to register to vote, and review of the state voter file was extremely relevant in determining the impact of the challenged law. But *Scanlan* proves Intervenor-Defendants' point. There, the produced voter file did not include sensitive information like Social Security numbers or driver's license numbers, and it was produced in discovery subject to numerous, severe restrictions—including a scrupulous protective order that designates the file as "highly confidential," restricts its use to the present litigation, restricts viewing to only a tight circle of designated personnel using "air-gapped" computers, and mandates destruction

20

of the data after the case is closed. *See* Protective Order at 4, 13–17, Sched. A at 2–3, *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE (D.N.H. June 18, 2025), Dkt. Nos. 87 & 87-1. Far from supporting the DOJ, *Scanlan* shows how production of sensitive information, when truly necessary to advance voting rights, should be handled. The United States, in contrast, seeks the complete and unredacted Georgia voter file, with voters' sensitive personal information included, subject to zero restrictions except its own dubious assurances that it will comply with federal privacy rules — at least insofar as it sees fit.

Relatedly, the DOJ states that Georgia shares sensitive voter information through the Electronic Registration Information Center ("ERIC") to facilitate its compliance with federal list-maintenance requirements. Opp. at 37. This is incorrect: Voter data is converted via a hashing algorithm into a sequence of random characters prior to transmission to ERIC; this means it can be used to identify duplicate records without requiring the actual transmission of sensitive data. *See* Elec. Registration Info. Ctr., *Technology & Security Overview* (Sept. 29, 2025), https://perma.cc/H8YU-MCB7. Even if sensitive information was transferred (which it is not), under our constitutional structure, a state voluntarily sharing data with other states as part of election administration is patently different than forcing it to turn over data to the federal government, particularly

21

when the federal government has the demonstrated aim of creating a national voter database that would violate federal law.[7]

None of these privacy concerns are hypothetical. In its opposition, the DOJ states that it will comply with privacy laws, including the federal Privacy Act and Title III's confidentiality provision, 52 U.S.C. § 20704. *See* Opp. at 38–39. But as noted in Intervenor-Defendant's opening brief, the DOJ has admitted in recent court filings made on behalf of the Social Security Administration ("SSA") of misuse of voter data. *See* MTD Br. at 8 (discussing Notice of Corrections to the Record at 5, *AFSCME v. Soc. Sec. Admin.*, No. 25-cv-596, (D. Md. Jan. 16, 2026), Dkt. No. 197, in which the DOJ admitted that SSA's Department of Government Efficiency team executed a "Voter Data Agreement" with a political advocacy group with the "stated aim . . . to find evidence of voter fraud and to overturn election results in certain States"). These federal actors also shared Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.*

---

[7] The DOJ also notes that, on two occasions previously, it obtained statewide voter registration lists under Title III that contained sensitive voter information, including from Georgia. *See* Opp. at 33 & n.10. However, it also acknowledges that both of these cases were resolved by mutual agreement very early on in litigation; indeed, it appears one of them was resolved prior to any litigation at all. *See id.* A state's voluntary choice to turn over data in response to a request for documents says nothing about the requirements of Title III, if and when it makes a different choice with respect to a different request in the future.

A recent analysis by experts at the Electronic Privacy Information Center identified a host of other serious security concerns and concluded that the DOJ has violated the requirements of the Federal Information Security Modernization Act of 2014 with respect to its collection and retention of voter registration list data from states. *Analyzing DOJ's MOU for Voter Registration List Data for FISMA Compliance*, Electronic Privacy Information Ctr. (Feb. 2026), https://epic.org/documents/analyzing-dojs-mou-for-voter-registration-list-data-for-fisma-compliance/. The shortfalls include inadequate encryption of voter data, insufficient data access controls (such as multifactor authentication), and no audit log analysis or defined reporting process (meaning that no one will review who accesses the data and no mandated reporting of data breaches). *Id.* In addition, DOJ has failed to explain how it will vet third-party contractors who will access the data or safeguard voters' private information shared outside the DOJ. *Id.* Most concerningly, the DOJ plans to "archive" the data, creating a permanent federal registry of sensitive voter information. *Id.*; *see also* Lisa Danetz, *The Justice Department's Security Measures for Collecting Voter Rolls Are Inadequate*, Brennan Ctr. for Just. (Feb. 25, 2026), https://perma.cc/4WSD-DJKU.

In light of the DOJ's representations elsewhere and its documented issues maintaining confidentiality of voter data, Georgians could be forgiven for a bit of skepticism. Rather than relying on the DOJ's statements about its plans to maintain

confidentiality, redactions of sensitive voter information are required. *See Lynd*, 306 F.2d at 230 (holding that "appropriate process" as used in Title III includes "the power and duty to issue protective orders").

## CONCLUSION

For all of these reasons, Intervenor-Defendants Common Cause and Rosario Palacios respectfully request that the United States' Complaint be dismissed and the United States' motion to compel production be denied.

24

Dated: March 5, 2026

Respectfully submitted,

/s/William Hughes

William Hughes†
Theresa J. Lee†
Jonathan Topaz†
Sophia Lin Lakin†
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
whughes@aclu.org
tlee@aclu.org
jtopaz@aclu.org
slakin@aclu.org

Carlos A. Andino*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
carlos.andino@splcenter.org

Cory Isaacson, Bar No. 983797
Akiva Freidlin, Bar No. 692290
Briana Futch, Bar No. 007314
AMERICAN CIVIL LIBERTIES UNION OF
GEORGIA
P.O. Box 570738
Atlanta, GA 30357
cisaacson@acluga.org
afreidlin@acluga.org
bfutch@acluga.org

Bradley E. Heard, Bar. No. 342209
Jack Genberg, Bar No. 144076
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW, Suite 550
Washington, DC 20036
bradley.heard@splcenter.org
jack.genberg@splcenter.org

† *admitted pro hac vice*
* *application for admission pro hac vice
forthcoming*

25

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in 13-point Book Antiqua, a font and type selection approved in Local Rule 5.1(C).

/s/William Hughes
William Hughes