UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his Official Capacity as Secretary of State for the State of Georgia,<br><br>Defendant. | CASE NO: 1:26-CV-485-ELR<br><br>**RESPONSE IN OPPOSITION TO NAACP'S MOTION TO DISMISS (DOC. 80)** |

**MEMORANDUM OF LAW**

Plaintiff United States of America respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss filed by Intervenor-Defendant National Association for the Advancement of Colored People, National Association for the Advancement of Colored People Georgia State Conference, Georgia Coalition for the People's Agenda, and Quinette Westbrooks ("NAACP") (Doc. 80). For purposes of judicial economy, the United States incorporates by reference but does not restate arguments made in its prior response to motions to dismiss (Doc. 31) as the arguments raised by the NAACP are largely duplicative.

**I. BINDING PRECEDENT CONFIRMS THE BROAD SCOPE OF TITLE III**

Binding precedent forecloses NAACP's attempt to narrow Title III to a subset of enforcement activity. Courts have long recognized that Title III authorizes the Attorney General to obtain and inspect federal election records and was specifically designed to prevent state interference in a federal investigation. See *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962). That authority is not limited to any single type of claim, nor conditioned on a prior showing of intentional discrimination.

Nothing in the statutory text imposes the restriction Defendants propose. To the contrary, Title III's broad language reflects Congress's intent to ensure that the Attorney General can access the records necessary to carry out its enforcement responsibilities. NAACP's contrary reading would improperly graft limitations onto the statute that Congress did not include and that courts have never recognized.

## II. TITLE III IS NOT LIMITED TO INVESTIGATIONS OF INTENTIONAL DISCRIMINATION

NAACP asserts that Title III may be used only to investigate intentional voting discrimination. (NAACP Br. at 16–17). That assertion is incorrect. As the United States has explained in other litigation—the Attorney General has consistently used Title III to obtain records necessary to enforce a range of federal election laws, including statutes governing voter registration and list maintenance.

The United States has used the CRA in most voting statutes that the Civil Rights Division enforces. As mentioned in earlier briefing, the United States has used the CRA to obtain statewide voter lists to assess list maintenance in Georgia

and Texas. *See* U.S. Br., Doc. 31-1 at 33 & n. 10. Similarly, in 2007, the United States entered into a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *United States v. State of Maine and Matthew Dunlap*, No. 1:06-cv-00086 (D. Me. April 4, 2007). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election. See Ex. 1 (emphasis added).[1]

In 2024, the Attorney General invoked Title III authority in two other matters concerning list maintenance where Alabama provided voter's driver's license and SSN4 data. *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024). That same year, the Attorney General used Title III to request "similar materials" from the Commonwealth of Virginia and a county in Virginia. *United States v. Virginia, No. 1:24-cv-1807 (E.D. Va. Oct. 11, 2024)*.

The United States has also used Title III of the CRA in enforcement of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). The United

---

[1] Paragraph 11 of the Consent decree explicitly invokes the CRA at 42 U.S.C. § 1974. 42 U.S.C. § 1974 was recodified at 52 U.S.C. § 20701. *See also McIntyre v. Morgan*, 624 F.Supp. 658, 664 (S.D. Ind. 1985) (42 U.S.C. § 1974 requires preservation of election records)

States sued Alabama for the State's noncompliance with 42 U.S.C § 1973ff-1(c), which required the State to report to the Election Assistance Commission, not later than ninety days after a regularly scheduled general election for Federal office, certain data regarding ballots from absent uniformed services voters and overseas voters. The United States sought data in 21 Alabama counties under the CRA, and the Court issued an Order approving that request. *See* Ex. 2. The United States then sent letters to each of the counties demanding the election records. *See* Ex. 2. A similar lawsuit was filed in Vermont to obtain records for enforcement of the UOCAVA reporting requirement. *See United States v. Vermont*, No. 08-cv-217 (D. Vt. Oct. 30, 2008), and the parties agreed that election officials are required to retain election records under the CRA. *See* Ex. 3.

The Federal Prosecution of Election Offenses (8th ed. 2017) explains under the heading, "Retention of Federal Records: 52 U.S.C. § 20701" that "[t]he detection, investigation, and proof of election crimes – and in many instances Voting Rights Act violations – often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes." U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 75 (8th ed. 2017). It provides that "under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained

if the documents or records were generated in connection with an election that included one or more federal candidates." *Id*. at 78.[2]

The NAACP is not wrong that the United States has also used the CRA for enforcement of the Voting Rights Act. For example, the United States sought election records from Georgia counties gathering evidence for the lawsuit under Section 2 of the Voting Rights Act in *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), Doc. 1. The Civil Rights Division sought election information from 159 counties in Georgia, and demand letters under Title III of the CRA were sent to some of those counties. *See* Ex. 4. However, the historical practice of using the CRA to enforce most of the federal election statutes the United States enforces reflects the CRA's function as an investigative tool supporting enforcement of federal voting protections more broadly, not a narrow mechanism confined to a single category of racially discriminatory claims.

In addition to the history of this use of the CRA, in a recent decision, the court in *United States v. Benson,* No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *8 (W.D. Mich. Feb. 10, 2026), *appeal filed*, No. 26-1225 (6th Cir. Feb. 25, 2026) held that "The CRA aids the Attorney General in assessing states' compliance with

---

[2] The Department of Justice in April 2024 also issued guidance titled, "Federal Law Constraints on Post-Election Audits." The guidance explains Title III of the CRA requires election officials to retain election records. "The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate and prosecute both civil and criminal election matters under federal law." 2d Neff Decl., Ex. 5.

federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Benson* further held that "Thus, the DOJ may use the CRA to investigate possible violations of the NVRA. *See also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (administrative subpoena should be enforced 'if the inquiry is within the authority of the agency')." *Id.*

## III.   HAVA CONFIRMS—RATHER THAN LIMITS—TITLE III AUTHORITY

NAACP argues that because the Help America Vote Act ("HAVA") does not contain its own disclosure provision, the Attorney General lacks authority to obtain the requested records. However, when Congress enacted HAVA, it did so against the backdrop of Title III's existing inspection authority. Congress was thus fully aware that the Attorney General already possessed a mechanism to obtain election records. Its decision not to replicate that authority in HAVA reflects that no additional disclosure provision was necessary—not that such authority was absent. *See* NAACP Br. at 18–19.

NAACP's position would invert this logic by treating congressional silence as a withdrawal of preexisting authority. There is no basis for that inference. Nothing in HAVA purports to limit or displace Title III, and this Court should decline to read such a limitation into the statute.

## IV. GEORGIA'S STATE-LAW PRIVACY PROVISIONS ARE PREEMPTED

NAACP also relies on Georgia law to justify withholding categories of responsive information. That reliance is misplaced. Where Congress has authorized the Attorney General to obtain and inspect election records, a State may not nullify that authority by invoking its own disclosure restrictions. Here, the only way that the Attorney General can assess whether Georgia is actually collecting the driver's license and SSN4 information required by 52 U.S.C. 21083(a)(5)(A) on the voter registration application is to examine those election records. That information is not provided in the redacted or public voter list.[3] There is no question that enforcement of the list maintenance requirements of HAVA is for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *See Foster v. Love*, 522 U.S. 67, 69 (1997).

---

[3] If the Movants' position were to be adopted, it would eviscerate HAVA enforcement of 52 U.S.C. 21083(a)(5)(A) and list maintenance in general. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA by having access to the voter identification numbers required by federal law. That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.

Here, the Attorney General has issued a lawful demand under Title III for records relevant to enforcing federal voting statutes. To the extent Georgia law would prohibit disclosure of those same records, it must yield.

## V. THE UNITED STATES' PURPOSE IS LAWFUL AND LIMITED TO HAVA AND NVRA COMPLIANCE

Finally, NAACP's speculation about the United States' purpose provides no basis to deny enforcement. The record is clear: the Civil Rights Division seeks these records to assess compliance with the National Voter Registration Act ("NVRA") and HAVA. That is a proper and lawful use of Title III.

As the First Neff declaration states, the Civil Rights Division's purpose for obtaining voter rolls is limited to assess compliance with HAVA and the NVRA. (Doc. 31-2 Neff Decl. ¶¶ 2–6.) To the extent that this Court is concerned that the United States might use the election records for immigration enforcement or purposes other than determining compliance with HAVA or the NVRA, this Court can craft an order prohibiting such use when ordering Secretary Raffensperger to comply with the CRA demand.

## VI. CONCLUSION

Title III authorizes the United States' request, binding precedent confirms its scope, and neither HAVA nor state law narrows that authority. The Court should enforce the United States' demand.

DATED: March 27, 2026               Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/     *Brittany E. Bennett*
BRITTANY E. BENNETT
GA Bar No. 717377
CHRISTOPHER J. GARDNER
GA Bar No. 163932
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 812-2631
Email: Christopher.Gardner@usdoj.gov
Email: Brittany.Bennett@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1 (D), the undersigned hereby certifies that the foregoing brief was prepared in Times New Roman, a font type selection approved by the Court in L.R. 5.1(B).

/s/ *Brittany E. Bennett*
        BRITTANY E. BENNETT

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/      *Brittany E. Bennett*
BRITTANY E. BENNETT
CHRISTOPHER J. GARDNER
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: Christopher.Gardner@usdoj.gov
Email: Brittany.Bennett@usdoj.gov